OPINION OF THE COURT
 

 Titone, J.
 

 In
 
 Unigard Sec. Ins. Co. v North Riv. Ins. Co.
 
 (79 NY2d 576), we held that, in contrast to situations involving primary liability insurance policies, the breach of the prompt-notice provisions in a reinsurance policy is not a ground for disclaiming coverage unless the reinsurer can show that it was actually prejudiced by the delay. The issue in this case is whether the analysis in
 
 Unigard
 
 should be applied to a breach of the prompt-notice clause in a policy providing excess liability coverage. Concluding that the rights and obligations of excess insurers are more analogous to those of primary insurers than to those of reinsurers, we hold that the
 
 Unigard
 
 rule is inapplicable to providers of excess liability insurance.
 

 
 *438
 
 The underlying claim in this case arose out of a December 23, 1985 incident in which an entire family of five died in their Alabama home due to carbon monoxide poisoning. The origin of the deadly gas was a furnace that had been serviced by Mobile Gas Co. Mobile maintained three different levels of liability insurance coverage consisting of a $300,000 primary liability policy with Liberty Mutual Ins. Co., a $5 million excess policy provided by plaintiff American Home Assurance Co. and a second $10 million "package” layer of excess insurance with seven different companies assuming some specified portion of the risk. Plaintiff American was responsible for 40% of this second layer of excess coverage, defendant National Insurance Co. was responsible for 10% and defendant International Insurance Co. was responsible, for up to 5%.
 

 After an investigation, Liberty Mutual, the primary insurer, promptly acknowledged the lack of any viable defense to the underlying claim and agreed to contribute the entire face amount of the policy to any settlement that might be negotiated. Since it was apparent that the Liberty Mutual policy would not be sufficient to cover the claim, on August 29, 1986, Mobile’s attorney advised American of the status of the lawsuit. At that point, Mobile’s attorney assessed the probability of an unfavorable verdict at 100%.
 

 Without notifying the other second-level excess carriers, American went forward with an attempt to settle the wrongful death claim for $5.3 million, the full amount of the primary and first-level excess coverage. It was only after this effort proved unsuccessful that American notified the second-tier excess carriers of the claim’s status and advised them that the plaintiff estate was seeking $12.2 million in settlement. On December 22, 1986, American again contacted the other excess insurers to advise of its intention to offer up to $12.5 million in settlement, an amount that would clearly require a contribution from those insurers. Ultimately, American was able to settle the claim for $11.5 million, some $6.2 million more than was available under the primary and first-level excess policies.
 

 Defendants National and International, as well as two of the other second-tier excess carriers (Republic Insurance Co. and United National Insurance Co.) refused to contribute their proportional shares of the $6.2 million, arguing that they had not been given timely notice as required by their policies. In response, American brought separate State court actions against National and International and also brought actions against the other two disclaiming carriers. Those actions were ultimately removed to Federal court.
 

 
 *439
 
 In April of 1992, the Federal District Court held that the second-tier excess carriers had a valid ground for disclaiming based on late notice
 
 (American Home Assur, Co. v Republic Ins. Co.,
 
 788 F Supp 214, 216,
 
 affd
 
 984 F2d 76,
 
 cert denied
 
 508 US 973). Further, relying on
 
 Security Mut. Ins. Co. v Acker-Fitzsimons Corp.
 
 (31 NY2d 436), the court rejected American’s contention that the excess insurers could not disclaim for late notice in the absence of a showing of prejudice. At the time it made its determination, the Federal District Court did not have the benefit of our decision in
 
 Unigard Sec. Ins. Co. v North Riv. Ins. Co. (supra).
 

 The decision in the Federal case had an immediate impact on the State court actions against National and International. American’s primary argument in the State court actions was that those defendants could not assert late notice as an affirmative defense without making a concrete showing of prejudice. Based on that theory, American had already moved to strike their affirmative late-notice defenses. Once the decision in the Federal action was handed down, National and International promptly moved for summary judgment dismissing the complaints, asserting that the Federal decision, which involved substantially identical facts, precluded American from arguing either that they had received timely notice or that actual prejudice had to be shown. The Supreme Court in both actions adopted defendants’ collateral estoppel arguments and granted their motions for summary judgment.
 

 On American’s appeal, however, the Appellate Division reversed and, in two separate orders, denied defendants’ motions for summary judgment and reinstated the complaints against them
 
 (American Home Assur. Co. v International Ins. Co.,
 
 219 AD2d 143;
 
 American Home Assur. Co. v National Cas. Co.,
 
 227 AD2d 160). At the outset, the Court concluded that the salient question of the need for a prejudice showing was a purely legal one as to which the collateral estoppel bar is inapplicable
 
 (see,
 
 219 AD2d, at 147). With respect to the merits of that question, the Appellate Division held that the analysis we applied in
 
 Unigard
 
 to reinsurance carriers should control in this dispute among excess insurers because of the similarity of the excess carriers’ roles and the role of the
 
 Unigard
 
 reinsurer
 
 (id.,
 
 at 147-151). The Appellate Division subsequently granted defendants National and International leave to appeal, certifying the following question in each case: "Was the order of this Court, which reversed the order of the Supreme Court, properly made?”
 

 
 *440
 
 Initially, we note our agreement with the Appellate Division’s resolution of the collateral estoppel question. Contrary to defendants’ arguments, the critical issue plaintiff American proffers — whether an excess carrier must make a showing of actual prejudice when it seeks to avoid its coverage obligations because of late notice — is a pure question of law. Consequently, the doctrine of collateral estoppel does not preclude American from litigating that issue again, despite the Federal courts’ prior adverse determination on the point (see,
 
 Matter of McGrath v Gold,
 
 36 NY2d 406).
 
 [1]
 

 As to the merits, most liability- insurance contracts contain clauses requiring the insured to provide prompt notice of an occurrence implicating coverage. Under traditional contract-law principles, the breach of such a contractual condition would excuse the aggrieved party’s performance only if that party was actually prejudiced by the delay
 
 (see, e.g., Restoration Realty Corp. v Robero,
 
 58 NY2d 1089, 1091;
 
 J.N.A. Realty Corp. v Cross Bay Chelsea,
 
 42 NY2d 392, 395). In
 
 Security Mut. Ins. Co. v Acker-Fitzsimons Corp. (supra),
 
 however, this Court held that a "limited exception” to this general rule exists for breaches of notice provisions in insurance contracts
 
 (see, Unigard Sec. Ins. Co. v North Riv. Ins. Co., supra,
 
 at 581). Accordingly, it is settled law in New York that "[ajbsent a valid excuse, a failure to satisfy the notice requirement vitiates the policy * * * and the insurer need not show prejudice before it can assert the defense of noncompliance”
 
 (Security Mut. Ins. Co. v Acker-Fitzsimons Corp., supra,
 
 at 440;
 
 see, Unigard Sec. Ins. Co. v North Riv. Ins. Co., supra,
 
 at 581).
 

 We revisited the question in
 
 Unigard Sec. Ins. Co. v North Riv. Ins. Co. (supra),
 
 a case involving a notice provision in a reinsurance agreement. In
 
 Unigard,
 
 we took a close look at the jurisprudential policies underlying the
 
 Security Mut.
 
 rule and concluded that there was no sound reason to apply it to notice disputes in the reinsurance industry. Unlike "primary” insur
 
 *441
 
 ers,
 
 [2]
 
 reinsurers are not responsible for providing a defense, investigating a claim or acquiring control of the claim in order to effect an early settlement
 
 (id.,
 
 at 583). Nor may they be held liable to the insured for a failure to accomplish any of the foregoing
 
 (id.).
 
 Thus, a delay in notifying the reinsurer of an occurrence has far less potential for prejudicing the reinsurer’s interests.
 

 Even more significantly, reinsurers are generally bound by the "primary” or direct insurer’s settlement. Indeed, "the interests of a reinsurer and the ceding primary insurer with respect to a pending claim are generally identical” and "[t]he 'follow the fortunes’ clause in most reinsurance agreements leaves reinsurers little room to dispute the reinsured’s conduct of the case”
 
 (id.).
 
 In contrast, the interests of primary insurers may conflict with those of their insureds in several important respects, giving rise to an especially acute need on the part of the primary insurer for prompt notice
 
 (id.).
 

 The Appellate Division concluded that a second-level excess insurer in these defendants’ position has more in common with a reinsurer than with a primary insurer and that, accordingly, such second-level insurers should be required to plead and prove actual prejudice as a necessary part of their late-notice defenses. The Court below reached this conclusion in part by looking at the considerable exposure that plaintiff American had in comparison to the smaller stake that defendants had and by assuming, as a matter of "common sense and prudence,” that defendants would not have initiated a separate investigation after the insurers with the most to lose — Liberty Mutual and American — had already fully investigated the claim.
 

 This analysis, however, is flawed in at least two important respects. First, it overlooks the important function of prompt
 
 *442
 
 notice in furnishing even an excess carrier with an opportunity to participate in settlement discussions at a time when its input is most likely to be meaningful
 
 (see, id.,
 
 at 581-582;
 
 Commercial Union Ins. Co. v International Flavors & Fragrances,
 
 822 F2d 267, 271). Even if defendants had opted to forgo independent investigations, they certainly would have insisted on having a role in the discussions and decisions that led to a settlement which penetrated the second layer of excess coverage and thereby triggered their policy obligations. Although American, as the party with the greatest exposure, may have had the greatest motive to minimize the settlement amount
 
 (see,
 
 219 AD2d, at 150), there was no agreement among the excess carriers that American could act as the lead carrier for purposes of negotiating a settlement or determining when notice to the other carriers was necessary. As the other second-level excess carriers were shut out of the process at the outset, there is no way of knowing what the outcome would have been if defendants’ voices had been heard at an early stage in the decision-making process. For that reason, the late-notice problem was not mitigated by the fact that American notified the other excess carriers after the failure of its attempt with Liberty Mutual to settle for the amounts in the primary and first-level excess policies. In this regard, it is noteworthy that each of the excess policies was a direct agreement with the insured and, under that agreement, the excess carriers were entitled to notice from their insured.
 

 Further, the Appellate Division’s emphasis on what it believed "common sense” and "prudence” would dictate represents an impermissible substitution of the court’s judgment for that of the excess insurer, which — unlike the reinsurer in
 
 Unigard
 
 — had a bargained-for contractual right to decide for itself whether and how extensively to investigate. Indeed, the Appellate Division’s focus on what it viewed as the practical similarities between second-tier excess carriers and reinsurers led that Court to overlook the important differences in their
 
 legal rights
 
 under their respective insurance contracts. Significantly, it was the limitations on reinsurers’ contractual rights that was critical to our holding in
 
 Unigard (see,
 
 79 NY2d, at 582-583).
 

 When their contractual rights and obligations are considered, it is apparent that excess insurers have little in common with reinsurers and, in fact, have the same interests that led us to conclude in
 
 Security Mut. Ins. Co. v Acker-Fitzsimons Corp. (supra,
 
 at 440) that prompt notice to primary
 
 *443
 
 insurers is a condition precedent to coverage. Apart from the fact that their coverage does not immediately attach after an occurrence but rather attaches only after the primary coverage for the occurrence is exhausted
 
 (see, e.g., Hartford Acc. & Indem. Co. v Michigan Mut. Ins. Co.,
 
 93 AD2d 337,
 
 affd
 
 61 NY2d 569), excess insurers have most of the rights and obligations of primary insurers. They have the right to investigate claims and to participate in settlement negotiations, and they have even been held to be entitled to make their own settlement determinations. Critically, excess policies do not contain the "follow the fortunes” clauses that typify reinsurance contracts and leave reinsurers "little room to dispute the reinsured’s conduct of the case”
 
 (Unigard Sec. Ins. Co. v North Riv. Ins. Co., supra,
 
 at 583). Accordingly, all of the salient factors point to the conclusion that excess carriers have the same vital interest in prompt notice as do primary insurers and that the
 
 Security Mut.
 
 rule should be applicable.
 

 That defendant excess insurers in this case were responsible for a relatively small portion of the total risk is not, contrary to plaintiff’s contentions, a sound basis on which to predicate an exception to the
 
 Security Mut.
 
 rule. Although their relative stakes may have been small, defendants were entitled to the fair opportunity to protect themselves that timely notice affords
 
 (see, Security Mut. Ins. Co. v Acker-Fitzsimons Corp., supra,
 
 at 440). Thus, they are entitled to assert a defense based on late notice even if they are unable to demonstrate that they were actually prejudiced by the delay in receiving notice of the wrongful death claim against Mobile.
 

 Accordingly, in each appeal, the order of the Appellate Division should be reversed, with costs, the order of Supreme Court reinstated and the certified question answered in the negative.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Levine, Ciparick and Wesley concur.
 

 In each case: Order reversed, etc.
 

 [1]
 

 . We note that the untimeliness of the notice defendants received is a mixed question of law and fact and, consequently, collateral estoppel is at least theoretically available as to that issue. Inasmuch as American has not argued that there were meaningful differences between the facts before the Federal court on that question and the facts in the present actions, the determination in the Federal action that notice was untimely is binding in these proceedings.
 

 [2]
 

 . As noted in
 
 American Home Assur. Co. v Republic. Ins. Co. (supra,
 
 984 F2d, at 77), the term "primary” insurance may be used to distinguish first-level liability coverage from either reinsurance or excess insurance. Both the Federal court in
 
 Republic Ins. Co.
 
 and the Appellate Division in the present cases attempted to discern the sense in which we had used the term in
 
 Unigard
 
 and then tried to draw legal inferences from their conclusions (984 F2d, at 77-78; 219 AD2d, at 150). At this point, it should suffice to note that the only question before us in
 
 Unigard
 
 was whether the
 
 Security Mut.
 
 rule applies to reinsurers and neither our verbiage nor our holding in
 
 Unigard
 
 should be construed to extend to other types of insurance coverage. In the present opinion, which concerns excess insurance, the term "primary” insurance is used to distinguish the coverage that is immediately triggered upon a defined occurrence from "excess” insurance, i.e., coverage which is triggered only after the former is exhausted.