**GREEN DOOR REALTY CORPORATION, Joan Sonnylal and Bysie Siew, Plaintiffs–Appellants,**

v.

**TIG INSURANCE COMPANY, Defendant–Appellee.**

**Docket No. 02–7367.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 8, 2002.

Decided: May 13, 2003.

Barbara A. Matarazzo, Matarazzo Blumberg & Associates, P.C., New York, NY, for Plaintiffs–Appellants.

Stephen Jacobs, Landman Corsi Ballaine & Ford, P.C., New York, N.Y. (Louis G. Corsi, Landman Corsi Ballaine & Ford, P.C., of counsel) for Defendant–Appellee.

Before: WALKER, Chief Judge, and OAKES and MINER, Circuit Judges.

MINER, Circuit Judge.

Plaintiffs-appellants appeal from a summary judgment entered in the United States District Court for the Southern District of New York (Casey, *J.*), dismissing their declaratory judgment action against defendant-appellee TIG Insurance Company ("TIG") to establish excess insurance coverage, the District Court having found as a matter of law that the notice of claim provided to TIG was not timely. According to the undisputed facts presented to the District Court: (1) Plaintiffs provided TIG with notice of the claim giving rise to excess coverage approximately one month after the underlying tort action was filed but approximately three years after the arson giving rise to that tort action oc-

curred; and (2) Plaintiffs provided a claim notice to the "producer" of the TIG policy three days after the fire was set. Because we conclude that there are material issues of fact concerning whether the producer of the TIG policy was TIG's agent for the purpose of accepting notices of claims from TIG's insureds, we vacate the summary judgment and remand the case to the District Court for proceedings consistent with this opinion.

## BACKGROUND

### I. *The Fire and the Relevant Insurance Policies*

This insurance coverage dispute arises out of a catastrophic fire that was intentionally set on the evening of Saturday, March 30, 1996, at a rent-stabilized apartment building (the "Building") located at 214 Audobon Avenue in New York City. The Building was owned and operated by plaintiff-appellant Green Door Realty Corporation ("Green Door"). In addition to the property damage caused by the fire, several tenants, including four children, and several fire fighters were either critically injured or killed. The fire and its consequences were the subject of contemporaneous news coverage in the local printed press.

At the time of the fire, the Building was insured for property damage by Travelers Insurance Company ("Travelers") for up to $15 million, for primary personal liability by Frontier Insurance Company ("Frontier") for up to $1 million, for excess liability by TIG for up to $25 million, and for additional excess liability by INA Insurance Company for $25 million in excess of the other policies. The TIG policy was issued to SIR Services—NY, Inc., which did business first under the name RSA Purchasing Group and later under the name Apartment & Property Owners Purchasing Group ("APOPG"). APOPG is a risk purchasing group for owners of rent-stabilized apartment buildings in New York City. Green Door, through its insurance broker IGM Brokerage Corp. ("IGM"), had applied for and was granted insurance under the TIG policy through APOPG.

The effective dates of the TIG excess policy were from December 31, 1995, until December 31, 1996. Of particular relevance to this appeal was the notice provision of the TIG policy, which required the insured to provide TIG with "prompt notice of an OCCURRENCE which may result in a claim." In particular, the notice of claim was required to include "[h]ow, when and where the OCCURRENCE took place" and "[t]he names and addresses of any injured persons and witnesses."

### II. *Actions Taken By Green Door With Respect to Its Insurers After the Fire*

On the evening of the fire, plaintiff-appellant Bysie Siew, the President and sole shareholder of Green Door, visited the Building to see if there was anything he could do. According to Siew, he had heard rumors from the tenants that a child or children had been injured, but he denied having been told that anyone had been killed. On the Monday morning following the fire, Siew telephoned IGM and spoke with Ramona DeLeon, his contact person at IGM and the individual who had placed Green Door's excess insurance policy with TIG through APOPG. He related to her the rumor he had heard that children might have been injured in the fire, expressed concern about his insurance coverage in light of the rumor, and asked her to inform his insurance companies immediately. According to Siew, DeLeon told him not to worry because the Building was insured under a $25 million TIG umbrella policy and advised him that she would notify his insurance carriers, including

TIG, and "do the necessary things that needed to be done to address these issues."

According to DeLeon, IGM's practice when it receives a call like the one she received from Siew was to get the information from the insured in writing, prepare an Acord report,[1] and forward it to APOPG. What steps DeLeon took with respect to the fire at Green Door's building is the subject of some dispute. According to DeLeon, after speaking with Siew, she called an individual named Robert King in the APOPG claims department and related to him the facts she had been given by Siew about the fire, although she was unsure about whether she told King that people may have been injured in the fire. DeLeon also stated that, about two weeks after the fire, she received a telephone call from an underwriter at APOPG named John Goetz, who (according to DeLeon) told her: "Do you know you gave me a line and there are three people dead?" According to King, however, he did not begin working at APOPG until May 28, 1996, and thus he was not working there when DeLeon claimed to have spoken to him. Indeed, to the best of King's recollection, he never had "any discussion[s] with [her] regarding [the] fire after [he] joined" APOPG. And, while Goetz admitted to having dealings with DeLeon during his tenure as an underwriter at APOPG, he flatly denied having "any conversation with [her] about any fatalities or personal injuries arising out of a March 30, 1996 fire in a building owned by Green Door."

After calling IGM, Siew retained Frank Jacobellis of Ben Gruber, Inc., an insurance adjuster, to assess the fire damage to the building and present Green Door's property damage claim to Travelers. On or about April 2, 1996, Jacobellis faxed to APOPG an Acord Property Loss Notice. The notice described the loss and damage as a "2 alarm fire caus[ing] extensive damage to building and serious injuries to tenants and firefighters." The cover sheet of the fax stated: "Please forward insurance company info [sic] to us and have company adjuster contact us." No insurance company information was included on the form. That same day, APOPG forwarded the notice to Travelers. On or about May 30, 1996, APOPG received from DeLeon notice of a $2700 property damage claim brought by one of Green Door's tenants in the New York City Civil Court. The next day, APOPG forwarded notice of the tenant's claim to Frontier on an Acord form. On or about October 19, 1998, APOPG sent DeLeon a "loss run," which listed a "personal property damage" claim of $1232.60 as a liability claim and a "fire loss" claim of $146,840.36 as a property claim.

### III. Underlying Tort Action and Denial of Coverage by TIG

Approximately three years after the fire, on March 29, 1999, a verified complaint was filed in New York Supreme Court, Bronx County, by various individuals against Green Door, Siew, and plaintiff-appellant Joan Sonnylal, who was employed by Green Door as the managing agent of the Building. The complaint alleged various causes of action sounding in tort and claimed damages in excess of $50 million arising from one death and injuries to eleven persons caused by the fire. On April 29, 1999, TIG first received notice of

---

1. An Acord General Liability Notice of Occurrence/Claim is the standard industry form used to provide notice of a third-party liability claim or an occurrence that may give rise to

such a claim. An Acord Property Loss Notice is the standard industry form used to provide notice of a first-party claim by an insured for damage to its property.

the fire when it received an April 19, 1999 letter from APOPG enclosing an Acord General Liability Notice from IGM dated April 16, 1999. The box indicating that the claim had previously been reported was not checked. The insured was identified as Green Door. The occurrence was described as "personal injuries." Also enclosed was a copy of the summons and verified complaint from the underlying tort action.

On May 18, 1999, TIG sent APOPG, Green Door, and Siew a letter in which it quoted the notice provision of the Policy and indicated that it appeared that the failure to provide TIG with notice for over three years constituted late notice and might preclude coverage. The letter requested that the recipients "advise [TIG within 10 business days] the reason why this incident was not reported to us in a timely fashion." Receiving no response to its May 18 letter, on July 1, 1999, TIG sent a letter to Green Door disclaiming coverage as a result of the breach of the notice condition in the policy.

## IV. *Proceedings in the District Court*

Plaintiffs initiated the action giving rise to this appeal in August 1999, by impleading TIG as a third-party defendant in the underlying tort action. In their third-party complaint, Plaintiffs sought a declaratory judgment that TIG was obligated to defend and indemnify them in the underlying action. TIG subsequently caused the third-party action to be severed, removed it to the District Court based on diversity of citizenship, and asserted untimely notice as an affirmative defense to coverage. Upon completion of discovery, the parties cross moved for summary judgment on TIG's notice defense. In their summary judgment papers, Plaintiffs argued that the undisputed facts showed that they had provided timely notice of the claim to TIG

days after the fire by calling DeLeon, who "gave this notice to TIG through [its] agent, [APOPG], by notifying both John Goetz, [its] underwriter, and by notifying Mr. King, in [its] claims department of these facts." Alternatively, Green Door argued that, as a matter of law, it was not obligated to notify TIG of the fire until Green Door learned of the underlying tort action.

In a March 12, 2002 unpublished opinion and order, the District Court granted TIG's motion for summary judgment and denied Plaintiffs' motion for summary judgment. In granting summary judgment for TIG, the District Court first concluded that timely notice should have been given to TIG in 1996, when Plaintiffs were aware that they faced a potential liability that implicated TIG's excess policy, and not in 1999, when they were served with the complaint in the underlying tort action alleging damages implicating TIG's excess policy. Turning to the question of whether the notice provided in 1996 by IMG to APOPG was timely notice to TIG, the District Court found that Plaintiffs had "failed to raise any genuine issue of material fact as to whether, by its words or conduct, TIG, the insurer, communicated to either IGM or Green Door that it intended for APOPG to be its agent." This timely appeal followed.

## DISCUSSION

### I. *Standard of Review*

We review de novo the District Court's grant of summary judgment, construing the evidence in the light most favorable to Plaintiffs. *See McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 123 (2d Cir. 2002). "Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* at 123–24 (citing Fed.R.Civ.P. 56(c)). "A dispute re-

garding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non moving party." *Id.* at 124 (internal quotation marks omitted). Thus, if "there is any evidence in the record from which a reasonable inference could be drawn in favor of [P]laintiffs, summary judgment is improper." *Id.* (internal quotation marks omitted). Consequently, TIG "must demonstrate the absence of any genuine factual dispute." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

On appeal, Plaintiffs argue that the District Court erred in concluding as a matter of law that (1) notice to TIG in 1999 was untimely and (2) the notice of the fire given by IMG to APOPG in 1996 was not timely notice to TIG because APOPG was not TIG's agent for the purpose of accepting claim notices from TIG's insureds. We address these arguments seriatim.

## II. *Was the 1999 Notice Timely?*

 Under New York law, absent a valid excuse, an insured's failure to provide timely notice of a claim to its excess insurer is a complete defense to coverage, regardless of whether the carrier was prejudiced by the late notice. *Am. Home Assurance Co. v. Int'l Ins. Co.*, 90 N.Y.2d 433, 440, 661 N.Y.S.2d 584, 684 N.E.2d 14 (1997). This rule recognizes the "important function of prompt notice in furnishing even an excess carrier with an opportunity to participate in settlement discussions at a time when its input is most likely to be meaningful." *Id.* at 441–42, 661 N.Y.S.2d 584, 684 N.E.2d 14. An insured has the burden of proving reasonableness of delayed notice and must exercise reasonable care and diligence and keep itself informed of accidents out of which claims for damages may arise. *Sec. Mut. Ins. Co. of N.Y. v.*

*Acker–Fitzsimons Corp.*, 31 N.Y.2d 436, 440–41, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972). A provision in an insurance policy that timely notice be given after an occurrence "merely requires that notice be given within a reasonable time under all of the circumstances." *Id.* at 441, 340 N.Y.S.2d 902, 293 N.E.2d 76. Thus, a good-faith belief by the insured that an incident does not trigger coverage under its insurance policy "may excuse or explain a seeming failure to give timely notice." *Id.* "But the insured's belief must be reasonable under all the circumstances, and it may be relevant on the issue of reasonableness, whether and to what extent, the insured has inquired into the circumstances of the accident or occurrence." *Id.* Finally, as this Court has observed, while the question of the reasonableness of an excuse for late notice is generally "a question of fact for the jury …, a delay may be unreasonable as a matter of law when either no excuse is advanced or the proffered excuse is meritless." *Olin Corp. v. Ins. Co. of N. Am.*, 966 F.2d 718, 724 (2d Cir. 1992).

 On appeal, Plaintiffs argue that their obligation to notify TIG of the fire first arose in 1999, when they learned of an underlying tort action for damages that were in excess of their primary coverage limits, and not in 1996, when they had no knowledge of liability that would implicate those limits. This argument was essentially rejected by the New York Court of Appeals in *Security Mutual Insurance Co.*, a case strikingly similar to this one. There, the occurrence giving rise to the coverage dispute was a fire at the insured's building. The people injured in the fire subsequently sued the landlord/insured. The landlord learned of the fire on the day it occurred. He later heard rumors that a certain unnamed fireman had

been injured in the fire. He telephoned this information to his insurance broker and followed up with a letter instructing the broker to notify his carrier. The broker was of the view that there was no obligation to report the incident to the carrier until a more concrete claim was made. Two months after the fire, a newspaper article was published describing the fire, indicating that firemen had sued the city for injuries and mentioning possible liability on the part of the building's owners. After the article was brought to the landlord's attention, he sent it to his broker, who again failed to follow through.

When the landlord was eventually served with the underlying action nineteen months after the fire, he forwarded the legal papers to his primary insurance carrier. The Court of Appeals held that summary judgment was properly entered for the carrier on its late notice defense. While noting that the newspaper article itself was not a sufficient predicate for providing the carrier with immediate notice, the court opined that it should have "cause[d] a reasonable and prudent person to investigate the circumstances, ascertain the facts, and evaluate his potential liability." *Security Mut. Ins. Co.*, 31 N.Y.2d at 442, 340 N.Y.S.2d 902, 293 N.E.2d 76. According to the court an "otherwise unreasonable delay of 19 months in giving notice may not be excused or explained on the basis of 'lack of knowledge' or 'belief of nonliability.'" *Id.* at 443, 340 N.Y.S.2d 902, 293 N.E.2d 76.

Here, as the District Court noted, even if Plaintiffs did not have actual knowledge of potential excess coverage liability until the underlying tort action was filed, the rumors they heard in 1996 were sufficiently serious to prompt Siew to express concern about his insurance coverage. These rumors put Plaintiffs on inquiry notice that

they might be subjected to liability in excess of their primary insurance coverage, and any failure to investigate further and notify TIG was unreasonable as a matter of law. Indeed, as discussed above, Travelers' investigation, which was conducted one month after the fire, revealed the deaths and injuries that later formed the basis of the underlying tort action. Moreover, it is difficult to fathom how Plaintiffs remained ignorant of these facts, given the amount of news coverage that the fire received. Thus, the District Court was correct in concluding that the "factual record [left] no room for doubt that Plaintiffs were painfully aware that they could be liable as a result of the fire, thereby triggering the need to provide notice."

Plaintiffs' reliance on Judge Sand's opinion in *Olin Corp. v. Insurance Co. of North America,* 743 F.Supp. 1044 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991), is misplaced. There, Judge Sand opined that an insured's obligation to notify its excess carrier is slightly different from the obligation to notify its primary carrier, in that notice to the excess carrier is required only when the occurrence is one that is likely to exceed the primary policy limits and implicate the excess coverage. *Id.* at 1054. That standard is no different from the one applied by the District Court in this case. Indeed, in *Olin Corp.,* Judge Sand granted summary judgment for the excess carriers on their late notice defense. *Id.* Accordingly, the District Court properly found that, as a matter of law, notice should have been given to TIG within a reasonable amount of time after the fire in 1996.

### III. *Was APOPG TIG's Agent?*

Plaintiffs argue in the alternative that timely notice was provided in 1996 to TIG, when they notified TIG's agent, APOPG,

through IGM.[2] "Under general principles of agency, the authority of an agent 'is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." ' *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir.1996) (quoting *Restatement (Second) of Agency* § 7 cmt. a (1958)). "Such authority may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *Id.* (citing *Restatement (Second) of Agency* § 7 cmt. b).

■ Agency may also arise from apparent authority, which "is 'entirely distinct from authority, either express or implied' . . . and arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.' " *Id.* (quoting *Restatement (Second) of Agency* § 8 cmt. a, § 27) (citations omitted and alterations in original). Thus, apparent authority "is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent." *Id.* (citing *Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir.1989)). Accordingly, IGM's notice to APOPG would have been legally sufficient if "[t]here [were some] evidence of . . . action on [TIG's] part, or facts from which a general authority to represent [TIG] may be inferred." *U.S. Underwriters Ins. Co. v. Manhattan De-*

*molition Co.*, 250 A.D.2d 600, 600, 672 N.Y.S.2d 384 (2d Dep't 1998). "The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Minskoff*, 98 F.3d at 708.

■ On the record before us, it cannot be gainsaid that there are material issues of fact concerning whether APOPG was TIG's agent under either the express or implied agency theories discussed above for the purpose of accepting claim notices from TIG's insureds. For example, a company called "American E & S" is listed in the policy declarations as the "producer" of the policy. In a confidential memorandum written in December 2000, Kikis Kyriacou, a Vice President at APOPG, described the relationship between American E & S and APOPG as one of insurance broker/wholesaler and insured/producer. Prior to July 1996, APOPG reported to American E & S, which acted as the insurance intermediary between TIG and APOPG. After July 1, 1996, however, APOPG became the producer of the policy and interacted directly with TIG.

Moreover, there is evidence in the record that APOPG had authority from TIG to renew insured members for insurance coverage and reported to TIG on a monthly basis by providing an updated, complete list of all insured entities and making the required premium payments. According to Kyriacou, while APOPG never held itself out as an agent for TIG, any belief that APOPG was TIG's agent may have been based "upon [the] perception of the working relationship between [APOPG] and TIG. Perhaps they may view [APOPG's] binding authority, accepting premium[s] and remitting [them] to TIG as an agent relationship." Moreover, De-

**2.** Like the District Court, for the purposes of summary judgment on the issue of whether APOPG was TIG's agent, we assume without

deciding that DeLeon provided APOPG with sufficient notice of Plaintiffs' claim, notwithstanding that this fact is contested.

Leon, the manager at IGM who placed the TIG policy with Green Door, stated that it was the practice of TIG to allow APOPG to accept the placement of insurance on its behalf. Specifically, DeLeon testified to her understanding that APOPG was "the agent who represent[ed]" TIG.

In addition, DeLeon identified several instances in which she understood that it was the practice at TIG to allow APOPG to accept loss notices on its behalf. Furthermore, it is of no small moment that APOPG accepted the Acord form from DeLeon on April 16, 1999 on behalf of TIG, without objection. On the other hand, there is also evidence in the record that APOPG did not have the authority to accept notices of claims from TIG's insured. For example, in his December 2000 confidential memorandum, Kyriacou stated that APOPG had "never ... held itself out as an agent for TIG."

Accordingly, given the conflicting evidence as to whether APOPG was TIG's agent based on actual or apparent authority, the District Court erred in concluding that there were no material factual disputes concerning the existence of a principal-agent relationship. Consequently, the District Court also erred in concluding as a matter of law that whatever notice was provided to APOPG in 1996 was not timely notice to TIG. If, on remand, this factual dispute is resolved in favor of Plaintiffs, the trier of fact must still determine whether they provided timely notice of the fire to APOPG.

## CONCLUSION

For the foregoing reasons, the summary judgment is vacated and the case is remanded to the District Court for further proceedings consistent with this opinion.