**ATLANTIC CONTAINER LINE AB; APL Co. Pte Ltd.; Cosco Container Lines Company Limited; Hapag–Lloyd Container Line GmbH; Lykes Lines Limited KKC; Mitsui O.S.K. Lines Ltd.; and Yang Ming Marine Transport Corporation, Plaintiffs,**

v.

**AREF HASSAN ABUL, INC.; Abul Sabah; Rednihom Inc.; Mohinder Singh; and Casings, Inc., Defendants.**

No. 1:02–CV–0160.

United States District Court, N.D. New York.

Aug. 26, 2003.

Hinman Straub PC, Attorneys for Plaintiffs, Albany, Paul M. Collins, Esq.

Bond, Schoeneck & King, PLLC, Attorneys for Defendant Casings, Inc., Albany, Arthur J. Siegel, Esq., of Counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

The plaintiffs are ocean-going common carriers ("plaintiffs" or "carriers") which commenced the instant action against defendants seeking to recover the costs that they incurred in shipping and disposing of waste tires transported from defendant Casings, Inc.'s ("Casings") facilities. As is relevant hereto, plaintiffs assert causes of action against Casings for fraud (*Seventeenth Cause of Action*), negligent hiring (*Eighteenth Cause of Action*), breach of contract (*Nineteenth Cause of Action*), and trespass to chattels (*Twentieth Cause of Action*).

Plaintiffs and Casings have elected to submit a joint record for review and a determination of the relevant facts and legal issues of liability on plaintiffs' causes of action. The equivalent of a bench trial conducted on the basis of the joint record which has been reviewed together with all submissions by the parties. The following are the Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

## II. FINDINGS OF FACT

The pertinent facts are fairly simple and straightforward. Casings is a New York corporation in the business of collecting and sorting used tires for re-sale. (Def.'s Proposed Findings of Fact and Conclusions of Law at ¶ 1.)[1] Casings sells approximately twenty percent of its tires as used tires. (Pl.'s PFFCL at ¶ 18.) The remaining tires are disposed of as waste tires by taking them to a tire disposal facility or paying outside vendors to remove them from its facilities. (*Id.* at ¶ 20.)

In April 2001, the individual defendant Abul Sabah ("Sabah") contacted Casings claiming that he could dispose of Casings waste tires for a fee of $450 per forty foot container.[2] (J.R., Ex. J, p. 56–57.)[3] Sabah claimed that there was a substantial market for the tires in India. (*Id.*) After checking the taxpayer identification number of corporate defendant Aref Hassan Abul, Inc. ("AHA"), the company with whom Sabah claimed to be affiliated, Casings accepted his offer. (*Id.* at pp. 57, 69.) In fact, Sabah was the sole and principal shareholder of AHA and operated it as his alter ego. (Pl.'s PFFCL at ¶ 13; Def.'s PFFCL at ¶ 10) According to the terms of the agreement, Sabah would arrange with a carrier for the containers to be shipped to a foreign destination; the carriers (or trucking companies hired by the carriers) would provide empty containers to Casings; Casings would fill the containers with waste tires and either call Sabah or the trucking companies to advise that the containers were ready for pickup; the carriers or trucking companies would then remove the filled containers from Casings facilities and deposit new empty containers at Casings facilities. (*Id.* at 58, 69, 72; Def.'s PFFCL at ¶¶ 24–26.) This process

---

1. Casing's proposed findings of fact and conclusions of law will be referenced as "Def.'s PFFCL." Plaintiffs' proposed findings of fact and conclusions of law will be referenced as "Pl's PFFCL."

2. Although this price was on the high side, it was within the range that Casings normally would pay for the removal of waste tires. (J.R. at Ex. J, pp. 65, 96,). After a few weeks, Casings renegotiated the price with Sabah down to the range of $350–$400 per container. (*Id.* at p. 73.)

3. "J.R." refers to the Joint Record submitted by the parties.

was repeated a number of times. The carriers would then load the filled containers onto their vessels and ship the waste tires to the foreign consignees identified by Sabah. (J.R. at Ex. E.)

On various occasions, AHA contracted with the carriers to ship the containers to consignees at various foreign destinations. (Def.'s PPFCL at ¶¶ 33, 42, 50, 60, 68; Pl.'s PPFCL at ¶¶ 75, 81, 87, 93, 98.). AHA's name was listed as the shipper and/or owner of the goods on the bills of lading with the carriers. (*Id.*; J.R. at Ex. E.) Sabah did not advise Casings of the identities of the overseas consignees of the waste tires. (J.R. at Ex. J, p. 79.) Sabah similarly did not advise Casings of his agreements with the carriers. (*Id.*)

When Casings released the containers to the carriers or the trucking companies, it would issue some sort of receipt or bill of lading. (*Id.* at 80.) The carriers or trucking companies did not provide Casings with any bills of lading. (*Id.*) AHA did not provide Casings with invoices. (*Id.* at 86.) Casing paid AHA on approximately twenty occasions for the removal of filled containers. (Pl.'s PPFCL at ¶ 44.)

During the course of shipment, plaintiffs learned that the consignees listed on the bills of lading either would not accept delivery of the waste tires, had no knowledge of the transaction, or could not be found. (Pl.'s PPFCL at ¶¶ 78, 84, 90, 96; Def.'s PPFCL at ¶¶ 40, 48, 59, 67.) Plaintiffs were never reimbursed for their freight charges or the costs they incurred in shipping and disposing of the waste tires. Being unable to recoup their losses from either Sabah or AHA, the plaintiffs commenced the instant action.

4. The other defendants have become somewhat irrelevant because, according to plaintiffs, they could not effectuate service against the individual defendants, and the corporate

## III. CONCLUSIONS OF LAW

The sole issue presented is whether Casings is liable for plaintiffs' damages under a theory of: (1) fraud; (2) negligent hiring; (3) breach of contract; or (4) trespass to chattels.[4]

### A. *Fraud*

Plaintiffs set forth two alternative bases for relief on their fraud claim: (1) that Sabah acted as Casings' agent when he defrauded plaintiffs; and (2) Casings should be held for the misdeeds of its independent contractors.

#### 1. *Agency*

Plaintiffs seek to hold Casings liable for Sabah's fraud under principles of agency. Plaintiffs contend that Casings owned the waste tires and paid Sabah to arrange for their disposal. It is plaintiffs' position that Sabah acted as Casings' agent in making those arrangements. Casings responds that Sabah was not an agent because he was not authorized to act on behalf of Casings, but rather, provided a service to Casings to remove the waste tires for a fee.

#### a. *Actual Authority*

■ An agent is "a person who consents to a fiduciary relationship resulting from another person's consent to allow the person to act on the other's behalf and subject to the other's control." 2A N.Y.Jur.2d Agency § 1. The Second Circuit has similarly stated that "[u]nder general principles of agency, the authority of an agent is the power of the agent to do an act or to conduct a transaction *on account of the principal* which, with respect to the principal, he is privileged to do because of the

defendants have defaulted after service upon the Secretary of State. (Pl.'s Mem. of Law at 3.)

principal's manifestations to him." *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir.2003) (internal quotations and citations omitted) (emphasis added).

Here, the evidence in the record demonstrates that Casings paid Sabah to dispose of the waste tires. (J.R. at Ex. J, pp. 56–59, 73 ("I told [the managers of Casings' facilities] we have a new customer for the tires, they will be supplying containers and they just needed to load them."), 81–82 (Casings issued a bill of lading to AHA without any reference to plaintiffs); Ex. J, Dep. Ex. 9.) Casings did not retain Sabah to act on its behalf, or on its account, to negotiate for the disposal of waste tires, and he was not subject to Casings' control. Stated otherwise, there is no evidence that Sabah had the implicit or explicit power to bind Casings or negotiate a transaction on its behalf. 2A N.Y.Jur.2d Agency § 20. Sabah made arrangements with plaintiffs on his own account. There was no actual agency relationship.

### b. *Apparent Authority*

■ An agency relationship also may be created by "apparent authority." Apparent authority "is entirely distinct from authority, either express or implied, and arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him." *Green Door Realty Corp.*, 329 F.3d at 289 (internal quotations and citation omitted). "Thus, apparent authority is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent."

*Id.* (internal quotations and citation omitted). "To recover on a theory of apparent authority, [plaintiffs] must establish two facts: (1) [Casings] was responsible for the appearance of authority in [Sabah or AHA] . . . and (2) [plaintiffs' reliance on the appearance of authority in Sabah or AHA] was reasonable." *FDIC v. Providence Coll.*, 115 F.3d 136, 140 (2d Cir.1997).

■ Here, there were communications between Casings and the carriers and/or trucking companies regarding when new containers would be dropped off and the full containers removed. (J.R. at Ex. J, p. 116, 122.) There also was communication between Casings and plaintiff Cosco Container Lines Company Limited ("COSCO") regarding the identity of a particular pseudonym (Cam Industrial, Inc.) used by Sabah. (*Id.* at 96–99.) These communications do not evidence words or conduct that could reasonably cause plaintiffs to believe that Casings consented to have acts done on its behalf by Sabah. Although plaintiffs knew that they were obtaining the waste tires from Casings, there is no evidence that plaintiffs believed they were shipping the waste tires on behalf of Casings. Rather, the evidence demonstrates that plaintiffs knew they were shipping the waste tires on Sabah's account.

For example, with the exception of the contracts with plaintiff COSCO, all of the shipping contracts list AHA as the shipper. (J.R. at Ex. E.) [5] The contracts with COSCO list Cam Industries, Inc. as the "Merchant" and cargo owner (*Id.* at docs. 404, 408.) Cam Industries, Inc. was a name used by Sabah, and not by Casings.. (J.R. at Ex. J, p. 97; Pl.'s PPFCL at ¶ 87.) In the contracts with plaintiff APL Co. Pte, Ltd. ("APL"), AHA was listed as "the own-

---

5. The contracts with Hapag list Casings, Inc. as the "Place of Receipt." (*See, e.g.,* J.R. at Ex. E, doc. 152.) The contracts with ACL list "Oceanside," which is the location of one of Casing's facilities, as the "Place of Receipt." (*Id.* at doc. 165.)

er of the cargo." (*See, e.g.,* J.R. at Ex. E. docs. 75, 76, 86, 87, 101, 102.)

The correspondence between Sabah through AHA and plaintiffs also suggests that all shipping was on his account. On August 10, 2001, AHA wrote a letter on its own letterhead to plaintiff Yang Ming Marine Transports ("YMM") stating that "[w]e offer you $1000.00 freight per 40' container to India." (J.R. at Ex. E, doc. 70.) [6] AHA also wrote on its own letterhead to YMM stating that "[o]ur receiver has reneged on the sales agreement we had with that receiver.... On the basis of our receiver's breach of contract, we hereby abandon the containers and instruct you to take whatever measures you need to take to protect your interests. We hereby abandon any further claim to the containers of cargo." (*Id.* at doc. 72; *see also id.* at doc. 73.) AHA wrote similar letters to Hapag and Atlantic Container Line. (*Id.* at docs. 143–45, 194, 360, 361.) These letters indicate that AHA was the shipper and the owner of the cargo.

The plaintiffs' correspondence was to the same effect. By letter dated July 24, 2001, plaintiff APL Co. PTE LTD. ("APL") wrote to AHA (not Casings) regarding the consignee's refusal to accept the cargo. (J.R. at Ex. E, doc. 110.) In that letter, APL considered AHA to be the shipper. (*Id.; see also id.* at Ex. E. doc. 111–12.) Correspondence from plaintiff Hapag–Lloyd Container Line ("Hapag") similarly evidences that it did not believe Sabah or AHA to be acting as agent for Casings. By letter dated June 20, 2001, Hapag wrote to AHA that "[t]his is an official notice that AREF HASSAN ABUL INC. is solely responsible for all incurred expenses including, but not limited to, Ocean freight, Demurrage, Customs penalties, operating costs, and administration fees." (J.R. at Ex. E, doc. 138.) There is no indication that at that time Hapag believed Casings to be responsible as the true shipper. There is similar correspondence from plaintiff Atlantic Container Line AB ("ACL"). (*Id.* at docs. 353 ("[ABA] ... requests that we auction off the goods to recoup our loss .... My intention is to notify [AHA] that they are liable for the charges."), 358 ("The shipper [is] Aref Hassan Anul [sic] Inc."), 362 ("[T]he payment of the freight charges to move this cargo at your request is exclusively the responsibility of [AHA] .... [Y]our company will be held liable for the remaining balance."). Plaintiffs have submitted insufficient evidence from which it may be found that Casings' words or conduct created any apparent authority in Sabah or AHA, or that even assuming it did, any reliance upon Sabah or AHA's authority was reasonable.[7]

### c. *Conclusion*

Because there was no actual agency relationship between Casings and Sabah or AHA, and there is no basis for finding that Sabah or AHA had apparent authority to act on behalf of Casings, Casings cannot be held liable under an agency theory.

### 2. *Independent Contractor*

Plaintiffs next argue that Casings should be held vicariously liable for Sabah's torts because Sabah was an independent contractor of Casings.

---

**6.** The document number refers to the Bates stamp number.

**7.** This is particularly so with respect to COSCO who entered into a contract with Cam Industries, an entity it knew nothing about. Because it did not know who Cam Industries was, COSCO contacted Casings which responded that "maybe that's Abul." (J.R. at Ex. J at 97.) This created a duty of inquiry on COSCO's part as to the existence of any apparent authority. *FDIC v. Providence Coll.,* 115 F.3d at 141.

■ As a general rule, an employer is not liable for the torts of an independent contractor. *Chainani v. Board of Educ.*, 87 N.Y.2d 370, 380–81, 639 N.Y.S.2d 971, 663 N.E.2d 283 (1995); *Backiel v. Citibank, N.A.*, 299 A.D.2d 504, 505, 751 N.Y.S.2d 492 (2d Dep't 2002). There are three exceptions to this rule: (1) where a non-delegable duty is involved, *see Rothstein v. State of N.Y.*, 284 A.D.2d 130, 726 N.Y.S.2d 636 (1st Dep't 2001); (2) where the work involved is inherently dangerous; and (3) where the employer is negligent in selecting, instructing or supervising the contractor. *Melbourne v. N.Y. Life Ins. Co.*, 271 A.D.2d 296, 298, 707 N.Y.S.2d 64 (1st Dep't 2000); *see Kleeman v. Rheingold*, 81 N.Y.2d 270, 274, 598 N.Y.S.2d 149, 614 N.E.2d 712 (1993).

### a. *Non–Delegable Duty*

■ "The 'nondelegable duty' exception may be invoked where a particular responsibility is imposed upon a principal by statute or regulation." *Chainani*, 87 N.Y.2d at 381, 639 N.Y.S.2d 971, 663 N.E.2d 283. Plaintiffs cite numerous environmental regulations regarding record keeping and reporting requirements imposed upon waste tire facilities. *See* 6 N.Y.C.R.R. § 360–13.3. Plaintiffs also cite a regulation requiring that waste tires be separated from their rims, 6 N.Y.C.R.R. § 360–13.3(b)(1), a practice with which Casings apparently does not always comply. (J.R. at Ex. J, pp. 38–40.) None of the cited regulations, however, impose a particular responsibility upon Casings with respect to the issues implicated in this case. For example, the regulations do not impose any obligation to investigate independent contracts or the claimed recipient of the waste tires and do not otherwise regulate where or to whom waste tires may be transported. *See generally* 6 N.Y.C.R.R. Part 360–13. Accordingly, there is no legal support for the conclusion that the removal of waste tires involves a non-delegable duty. *Chainani*, 87 N.Y.2d at 381, 639 N.Y.S.2d 971, 663 N.E.2d 283. Even if there was such a duty, there is no causal connection between any non-delegable duty regarding the disposal of waste tires and the harm suffered by plaintiffs.

### b. *Inherently Dangerous Work*

■ The second basis upon which liability may be imposed upon an employer for the conduct of its independent contractor is for inherently dangerous work. This exception "applies when it appears both that the work involves a risk of harm inherent in the nature of the work itself, and that the employer recognizes, or should recognize, that risk in advance of the contract." *Chainani*, 87 N.Y.2d at 381, 639 N.Y.S.2d 971, 663 N.E.2d 283 (internal quotations, alteration and citation omitted). Waste tires can be removed without the presence of any special dangers. Although it is environmentally sound to properly dispose of waste tires, plaintiffs provide no evidentiary or legal basis upon which to conclude that removing waste tires is inherently dangerous. *Chainani*, 87 N.Y.2d at 381, 639 N.Y.S.2d 971, 663 N.E.2d 283 (listing blasting, certain construction, working with high tension electric wires and other activity that is dangerous in spite of all reasonable care as matters that may be considered inherently dangerous); *see Saini v. Tonju Assocs.*, 299 A.D.2d 244, 246, 750 N.Y.S.2d 55 (1st Dep't 2002) (installing a temporary boiler is not inherently dangerous); *Baraban v. Orient–Express Hotels, Inc.*, 292 A.D.2d 203, 204, 739 N.Y.S.2d 366 (1st Dep't 2002) (placement of electrical wires is not inherently dangerous); *Robinson v. Jewish Hosp. and Med. Ctr.*, 275 A.D.2d 362, 364, 712 N.Y.S.2d 585 (2d Dep't 2000) (provision of anesthesiology services is not inherently dangerous). Even assuming the removal of waste tires to involve inherently dangerous work, again, there is no

causal connection between the work and plaintiffs' injuries. In other words, the damages to plaintiff were not caused by any special dangers inherent in the removal of waste tires.

### B. *Negligent Hiring*

▮▮▮ Plaintiffs also seek to hold Casings liable under a theory of negligent hiring. New York courts "have been cautious ... in extending liability to defendants for their failure to control the conduct of others. 'A defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control.'" *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232–33, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001) (quoting *D'Amico v. Christie*, 71 N.Y.2d 76, 88, 524 N.Y.S.2d 1, 518 N.E.2d 896 (1987)). Because "an employer has the right to rely on the supposed qualifications and good character of the contractor, and is not bound to anticipate misconduct on the contractor's part, the employer is not liable on the ground of his having employed an incompetent or otherwise unsuitable contractor unless it also appears that the employer either knew, or in the exercise of reasonable care might have ascertained, that the contractor was not properly qualified to undertake the work." *Maristany v. Patient Support Servs., Inc.*, 264 A.D.2d 302, 303, 693 N.Y.S.2d 143 (1st Dep't 1999). "To hold a party liable under theories of negligent hiring, negligent retention, and negligent supervision, a plaintiff must establish that the party knew or should have known of the contractor's propensity for the conduct which caused the injury." *Bellere v. Gerics*, 304 A.D.2d 687, 759 N.Y.S.2d 105, 107 (2d Dep't 2003) (citation omitted).

▮▮▮ Here, plaintiffs seek to hold Casings liable for a fraud committed by Sabah. Plaintiffs provide no authority for the proposition that Casings had any obligation to undertake an investigation into Sabah to ascertain whether he was likely to commit fraud on the carriers. *Hamilton*, 96 N.Y.2d at 233, 727 N.Y.S.2d 7, 750 N.E.2d 1055. Plaintiffs similarly fail to identify any reason why Casings should have inquired into what Sabah intended to do with the waste tires, including the nature or existence of his alleged consignees. That was irrelevant to Casings whose only interest was in the removal of the waste tires. To impose a duty of care upon Casings under these circumstances would extend liability too far and essentially would make Casings the guarantor of Sabah's intentional conduct. *Id.* Casings owed no duty of care to plaintiffs.

### C. *Breach of Contract*

#### 1. *Bills of Lading*

Plaintiffs next claim is that Casings is liable under the terms of the bills of lading. Plaintiffs' argument is that Casings should be considered the "shipper" or "merchant" as defined in the bills of lading, and therefore, responsible for the freight costs.

▮▮▮ A bill of lading " 'is a receipt given by the master of a ship acknowledging that the goods specified in the bill have been put on board' and 'is the document [that] contains the terms of the contract for the carriage of the goods agreed upon between the shipper of the goods and the shipowner.'" *Howard v. Norfolk S. Ry. Co.*, 316 F.3d 165, 166 n. 1 (2d Cir.2003) (quoting William R. Anson, Principles of the Law of Contract 380 (Arthur L. Corbin ed., 3d Am. ed.1919), quoted in Black's Law Dictionary 159 (7th ed.1999)). Accordingly, the bills of lading are contracts that govern the rights and liabilities of the parties.

▮▮▮ Here, there are no contracts between Casings and any of the plaintiffs. Casings is not a party or signatory to any of the bills of lading. (J.R. at Ex. E.) The

carriers did not provide any bills of lading to Casings. (J.R. at Ex. J, pp. 80, 124.) Similarly, Casings is not identified as an owner, shipper, or merchant in any of the bills of lading. (*Id.*) As discussed, Sabah was not Casings' agent, and therefore, did not enter into the contracts on behalf of Casings. Some of the bills of lading do indicate that Casings is the place of receipt. This does not, however, transform Casings into a party to the contracts or a merchant.

Casings did contact the plaintiffs when it was time to pick up the filled containers and drop off new containers (J.R. at Ex. J, pp. 116–17). It also loaded the containers, (*Id.* at 72), and thus obviously had some contact and involvement with plaintiffs. However, Casings did not retain plaintiffs (*id.* at 58–59); did not make the shipping arrangements (*id.* at 58–59, 79–80, 115); did not negotiate the terms of the shipping (*id.*); did not locate the claimed consignees (*id.* at 56, 58); did not know the identities of the claimed consignees (*id.* at 79); did not make any representations to plaintiffs regarding the shipping destinations; did not make any representations to plaintiffs regarding the contents of the containers; did not assent to liability for the shipping charges (J.R. at Ex. E); and otherwise had no interest in shipping the waste tires overseas to Sabah's alleged consignees (as opposed to simply finding someone to remove the waste tires). All of the above were solely the concerns of Sabah. The bills of lading Casings gave to the trucking companies listed the names of Casings and AHA, but not any of the plaintiffs. (J.R. at Ex. J, pp. 81–81.) There is no basis for concluding that Casings had a contractual relationship with plaintiffs.

### 2. *Quasi-contract*

Plaintiffs cite to *Contship Containerlines, Inc. v. Howard Indus.*, 309 F.3d 910 (6th Cir.2002), for the proposition that they had a quasi-contract with Casings.

In *Contship*, Howard Industries retained Transworld, a freight forwarder, to assist in booking and preparing certain cargo for shipment to a particular consignee in the Nation of Syria. Howard paid Transworld for all the payments alleged to be due the shipper, Contship. Transworld made arrangements with Contship, listing Howard as the shipper. Howard delivered its goods to Contship's vessels. Transworld did not pay Contship. Thus, Contship sought satisfaction of the freight charges from Howard. In finding a quasi-contract, the Sixth Circuit noted that "[t]he ... facts ... are sufficient to establish the necessary elements of quasi-contract. Howard Industries delivered its goods to Contship, and Contship transported those goods exactly as Howard Industries wished. In doing so, Contship conferred a benefit on Howard Industries."

 The instant case is quite different from *Contship* and the circumstances of this matter must be put into perspective. In *Contship*, Howard retained Transworld to assist in booking and preparing its cargo for shipment. Here, Casings did not retain AHA to assist in booking shipments; rather, Casings paid AHA to remove the waste tires from its facilities. In *Contship*, Howard had an interest in shipping its goods to its consignee in Syria. Here, by contrast, Casings' consignee was AHA. Casings' only concern was that it found a person (Sabah) who would remove its waste tires. What Sabah did with the waste tires, where he intended to ship the waste tires (whether overseas or otherwise), or who he intended to sell the waste tires to was of no concern to Casings. Thus, unlike in *Contship*, plaintiffs did not deliver the waste tires according to Casing's wishes. In *Contship*, Howard delivered the goods to Contship. Here, at AHA's direction, the carriers picked up the goods from Casings' facilities. Finally, in *Contship*, Howard was listed on the bill of lading as the shipper and Contship billed

Howard directly. Here, Casings was not listed as the shipper and plaintiffs billed AHA directly. Under the facts and circumstances of this case, equity and good conscience do not require Casings to pay restitution to plaintiffs. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir.2000).

### 3. Conclusion

Furthermore, until the commencement of this litigation, there was no evidence that plaintiffs looked to Casings for payment of the shipping costs or otherwise believed Casings to be liable. Plaintiffs did not send bills to Casings, but to AHA. To the extent plaintiffs claim that Casings is a "merchant" as defined in the bills of lading, it is difficult to conceive how Casings can be bound by a definition contained in a contract to which it is not a party. There is no basis upon which to conclude that Casings is contractually liable for the shipping costs.

### D. Trespass to Chattels

■■■ Plaintiffs next claim that Casings is liable for trespass to chattels because it intentionally placed valueless waste tires into plaintiffs' shipping containers thereby depriving plaintiffs of the use of those containers for the period of time that the waste tires remained in the containers.

Under the principle of law that allows recovery for a trespass to chattels, it is necessary that the defendant have acted for the purpose of interfering with the chattel, or what is almost the same thing, that he have acted with knowledge that such would be the result of his conduct. Trespass is an intentional harm at least to this extent; while the trespasser, to be liable, need not intend or expect the damaging consequence of his intrusion, he must intend the act which amounts to or produces the unlawful invasion, *and the intrusion must at least be the immediate or inevitable consequence of what he willfully does*, or

which he does so negligently as to amount to willfulness.

*Buckeye Pipeline Co. v. Congel–Hazard Inc.*, 340 N.Y.S.2d 263, 41 A.D.2d 590, 590 (4th Dep't 1973) (internal quotations and citation omitted)(emphasis added).

■■■ Here, Casings did intentionally place the waste tires into plaintiffs' containers. However, there was no reason for Casings to believe that a trespass to chattels would be the likely outcome of its conduct. The injury was not the "immediate or inevitable consequence" of Casings' conduct. It was Sabah's intentional conduct that directly and proximately caused the interference with plaintiffs' property. Moreover, plaintiffs consented to Casings' conduct and nothing Casings did exceeded plaintiffs' consent. This claim also must be dismissed.

### IV. CONCLUSION

Sabah was not Casings' agent, either actual or apparent, and therefore, it is not liable for his torts under a theory of agency liability. Assuming Sabah to be an independent contractor, Casings may not be held liable for his fraud because: (1) Casings did not have a non-delegable duty regarding the removal of waste tires; (2) Casings was not involved in a inherently dangerous activity; and (3) Casings did not owe plaintiffs a duty of care to investigate Sabah's background to ascertain whether he was likely to commit fraud. There was no contractual relationship between Casings and plaintiffs. Casings did not purposely interfere with plaintiffs' use of their containers.

Accordingly, it is

ORDERED that

1. Plaintiffs' Seventeenth, Eighteenth, Nineteenth, and Twentieth Causes of Action are DISMISSED;

2. The Clerk of the Court is directed to enter judgment DISMISSING the com-

plaint in its entirety as against defendant Casings, Inc.; and

3. On or before September 5, 2003, plaintiffs shall file with the Clerk of the Court, whether they intend to continue this action as to the remaining defendants.

IT IS SO ORDERED.