**UNITED STATES LIABILITY
INSURANCE COMPANY,
Plaintiff,**

v.

**WINCHESTER FINE ARTS SERVICES, INC., Utica National Insurance Group, Citi Capital Commercial Leasing Corp., Jason Denny, Lindon F. McKenzie and Michael D. Petrovich, Defendants.**

No. 03 Civ. 5003 VM.

United States District Court,
S.D. New York.

Sept. 22, 2004.

Alan E. Kleinberger, Steven Verveniotis, Miranda & Sokoloff, LLP, Mineola, NY, for Plaintiff.

Paul M. Schindler, Fieldman Hay & Ullman, LLP, New York City, Marisa Goetz, Faust, Goetz, Schenker & Blee, LLP, Keith Lawrence Kaplan, Block & O'Toole, New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff United States Liability Insurance Company ("U.S. Liability") brings this diversity action against its insured, Winchester Fine Art Services, Inc. ("Winchester"); and Jason Denny and Lindon F. McKenzie (the "Claimants"). Also named as defendants are Winchester's primary insurer, Utica National Insurance Group ("Utica"); Citi Capital Commercial Leasing Corp.; and Winchester employee Michael D. Petrovich ("Petrovich"). U.S. Liability seeks a declaratory judgment to disclaim coverage for an underlying personal injury action now being litigated in New York State court that the Claimants brought against Winchester.

U.S. Liability has moved for summary judgment with respect to all of the claims and counterclaims at issue. Winchester and the Claimants oppose this motion and have responded with their respective cross-motions for summary judgment on all the claims. The crux of the parties' dispute centers on whether Winchester provided U.S. Liability with timely notice of the underlying personal injury action in accordance with the terms of Winchester's excess liability insurance policy with U.S. Liability (the "Excess Policy"). U.S. Liability asserts that notice was untimely under New York law and under the terms of the Excess Policy, and as such, it is entitled to disclaim coverage. Winchester responds that it did not provide notice sooner because it never formed a good-faith belief that the personal injury action would implicate the Excess Policy. Winchester argues that U.S. Liability was itself untimely in disclaiming coverage and should be precluded from so doing. The Claimants assert that U.S. Liability may not disclaim coverage because they (the Claimants) notified U.S. Liability of the claim after diligent efforts to discover the existence of the Excess Policy.

As discussed in greater detail below, the Court holds as a matter of law that: (1) Winchester failed to timely notify U.S. Liability of the underlying personal injury action in compliance with the terms of the Excess Policy and applicable New York law; (2) the Claimants did not cure Winchester's delay in notifying U.S. Liability; and (3) U.S. Liability properly denied coverage to both Winchester and the Claimants, and thus, did not waive its right to do so. Accordingly, the Court grants U.S. Liability's motion for summary judgment in its entirety and denies Winchester's and the Claimants' cross-motions for summary judgment in their entirety.

## I. BACKGROUND [1]

The facts of this case are not materially in dispute. On April 9, 2001, Petrovich was driving an automobile for Winchester when he was involved in an automobile accident with the Claimants. At the time of the accident, Winchester was insured by

---

1. The factual summary presented herein derives from the parties' pleadings in this action as well as the affidavits, declarations, Rule 56.1 statements, memoranda of law and accompanying exhibits the parties submitted in connection with the instant motions. Except where specifically referenced, no further citation to these sources will be made.

a primary liability insurance policy issued by Utica that provided liability coverage up to $750,000. Winchester also was insured by the Excess Policy with U.S. Liability. The Excess Policy provided coverage for liability in excess of the primary policy limit, up to a maximum of $4 million. The notice provision of the Excess Policy provides as follows:

Notice of Occurrence, Claim, offense, or Suit

Whenever it appears that an occurrence, claim, offense, or suit is likely to involve payment under this policy, written notice shall be given to us or our authorized representative by you or your designated representative as soon as practicable.

(Affidavit of Mark Shockley, dated May 19, 2004, at Ex. A.) The Excess Policy also provides that U.S. Liability has the right to participate in the defense of any claim that may involve payment under the policy and that both Winchester and Utica must cooperate with U.S. Liability with regard to any such defense. (*See id.*)

By letter dated April 17, 2001, the Claimants notified Utica of the automobile accident and stated that they had incurred serious injuries therefrom. The letter also requested information on whether Winchester carried any excess or umbrella insurance. In a subsequent letter dated January 29, 2002, the Claimants informed Utica that they had undergone surgery for their injuries and requested that Utica produce a sworn statement with regard to whether Winchester carried excess liability insurance. The January 29 letter also provided information on a verdict in an unrelated case with similar injuries and noted that the amount of the jury's damage in the unrelated case exceeded Utica's coverage amount in this case. The letter further stated that the Claimants' injuries

were serious, that Winchester was entirely liable for those injuries, and that the property damage arising from the accident was extensive.

On March 27, 2002, the Claimants initiated a personal injury action against Winchester, Citi Capital, and Petrovich in New York State Supreme Court, Bronx County for the injuries sustained in the accident (the "state court action"). In their complaint, the Claimants demanded $5 million each in compensation for their injuries.[2] Utica is undertaking Winchester's defense in the state court action and has retained counsel in the matter (hereinafter "Winchester's trial counsel").

By letter dated April 17, 2002, the Claimants forwarded copies of their medical records to Utica. These records indicated that the Claimants had undergone surgery and described additional injuries sustained from the accident. For a third time, the Claimants requested that Utica provide information regarding excess insurance coverage and that if there were no such coverage, that Winchester provide a sworn statement to that effect. The letter further notified Utica of the commencement of the state court action and included a copy of the complaint. The record reflects that Utica did not respond to the Claimants' repeated requests for information regarding excess insurance coverage.

As part of discovery in the state court action, the Claimants issued a Notice To Produce to Winchester's trial counsel, dated November 13, 2002, that requested all information regarding any excess or umbrella coverage in effect at the time of the accident that may be available to satisfy all or part of any judgment that may be entered in the state court action. The Claimants also submitted a Bill of Particulars to Winchester's trial counsel on or

2. The state court action is currently awaiting trial. The parties have included the relevant discovery materials in the record before the Court.

about November 13, 2002 detailing the injuries they sustained in the accident and the concomitant surgeries that would be required.[3] On or about January 24, 2003, the Claimants submitted a Supplemental Bill of Particulars that indicated that one of the Claimants' injuries would lead to osteoarthritis necessitating a knee replacement, and estimated that future medical costs for this Claimant alone would reach between $351,695 and $453,745, not including adjustments for inflation.

Following a preliminary conference in the state court action held on January 9, 2003, the state court issued a Preliminary Conference Order that erroneously indicated that Winchester had $1 million in primary insurance coverage. The Order did not indicate that Winchester owned an excess insurance policy. In response to this Order, Winchester's trial counsel later corrected the information regarding the coverage limit by indicating that the limit of its primary coverage with Utica was, in fact, $750,000. Again, Winchester's trial counsel did not mention that Winchester had an excess policy in place at the time of the accident.

By letter dated February 11, 2003, the Claimants again requested information regarding any excess insurance coverage from Winchester's trial counsel, including an affidavit if no such coverage existed. This request, like the previous requests, went unanswered. The February 11 letter also made reference to a telephone conversation the previous day between counsel for the Claimants and Winchester's trial counsel where they discussed excess coverage.

The correspondence regarding excess insurance coverage would not end there. By letter dated February 28, 2003, Frederick C. Aranki ("Aranki"), the principal trial attorney defending Winchester in the state court action, provided Utica with the last of several case status reports. In the February 28 report, Aranki stated that he was not aware of any applicable excess insurance policy carried by Winchester, and that he was in the process of preparing an affidavit from Winchester's president to so attest.[4] No such affidavit is in the record. This representation regarding excess coverage was confirmed in a March 7, 2003 letter from the Claimants to Utica (with a copy to Aranki), which indicated that Aranki had informed counsel for the Claimants in a telephone conversation that there was no excess coverage in effect at the time of the accident and that an affidavit to that effect was forthcoming.[5] The March 7, 2003 letter also described the extensiveness of the Claimants' injuries and the significant property damage to the vehicle.

By letter dated March 5, 2003, Winchester, through its general corporate counsel (hereinafter "Winchester's corporate counsel"), informed U.S. Liability of the state court action and forwarded copies of the Complaint and Summons.[6] In this notice,

---

3.  The Bill of Particulars indicated that one of the Claimants underwent surgery on January 23, 2002 to mend the torn rotator cuff in his shoulder and continues to suffer from back pain due to herniated discs in his back. The document further indicated that the other Claimant endured surgery to repair the damage to his knee and experiences persistent pain in his back and neck due to bulging discs in his spine.

4.  This report also indicated that the Claimants informed Aranki that it was their opinion

that Winchester's primary insurance coverage limit would not be sufficient to cover the Claimants' injuries.

5.  The March 7 letter further indicated that Utica had also represented to the Claimants' counsel in a telephone conversation that no excess coverage was available.

6.  U.S. Liability asserts that it received notice the following day. This one-day difference is immaterial to the Court's analysis herein.

Winchester indicated that it had only recently been advised that the Claimants had stated that the claim would exceed the primary coverage amount, and thus, U.S. Liability was being notified "as a precaution." Approximately one week later, U.S. Liability requested relevant documents pertaining to the state court action, including the pleadings, Bills of Particulars, and the various status reports that Winchester's trial counsel prepared for Utica as part of its defense of Winchester. U.S. Liability received these documents from Winchester's trial counsel on or about April 2, 2003. The cover letter to U.S. Liability suggested that Winchester was construing U.S. Liability's request for these documents as a tacit acknowledgment from U.S. Liability that it would be providing excess insurance coverage in the state court action. By letter dated April 1, 2003, Winchester first informed the Claimants of the existence of the Excess Policy.

On or about April 14, 2003, approximately two weeks after receiving the documents, U.S. Liability informed Winchester and the Claimants' counsel by letter (with copies to all the other parties in the state court action) that it was disclaiming coverage for Winchester's failure to comply with the notice provision of the Excess Policy.[7] This notice further informed the Claimants that they had failed to cure Winchester's untimely notice because the Claimants were not the first to notify U.S. Liability of the state court action. Notwithstanding U.S. Liability's disclaimer, the Claimants notified U.S. Liability by letter dated May 20, 2003, of their intent to avail themselves of the excess coverage.

U.S. Liability thereafter initiated the instant action seeking a declaration by this Court that it is not obligated to defend or indemnify Winchester for the state court

action due to Winchester's untimely notice. Pending before the Court is U.S. Liability's motion for summary judgment on this claim pursuant to Federal Rule of Civil Procedure 56. Both Winchester and the Claimants oppose U.S. Liability's motion and have each cross-moved for summary judgment asserting that U.S. Liability received timely notice of the state court action and did not timely disclaim coverage. Thus, Winchester and the Claimants claim that U.S. Liability is required to defend and indemnify Winchester under the terms of the Excess Policy.

## II. *DISCUSSION*

### A. *STANDARD FOR SUMMARY JUDGMENT*

The Court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court ascertains which facts are material by considering the substantive law of the action, for only those "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if a dispute of the material facts exists, summary judgment will be granted unless the dispute is "genuine," *i.e.*, "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

The initial burden rests with the moving party to demonstrate the absence of any

---

7. The record indicates that this notice did not reach the Claimants' counsel until April 21 due to a problem with the mail.

genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the non-moving party must provide "specific facts showing that there is a genuine issue for trial" in order to survive the motion for summary judgment. Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Shannon v. New York City Transit Auth.,* 332 F.3d 95, 98–99 (2d Cir.2003). The Second Circuit has granted summary judgment where a party failed to show any dispute over the facts that would entitle her to equitable tolling of the time requirements for her Title VII claim. *See Boos v. Runyon,* 201 F.3d 178, 185 (2d Cir.2000). In considering a motion for summary judgment, the Court must view the evidence in a light that is favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004). However, the Court must refrain from weighing the evidence and restrict its inquiry to whether there are triable issues of material fact. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Against this standard, the Court considers the issues raised by the parties' arguments in their respective moving papers.

## B. *WINCHESTER'S NOTICE OF THE CLAIM*

■ The first question raised by the pending motions for summary judgment is whether as a matter of law, Winchester provided timely notice of the state court action to U.S. Liability under the terms of the Excess Policy. U.S. Liability argues that Winchester's notice was untimely and thus, Winchester did not fulfill a condition precedent to coverage. On this issue, U.S. Liability asserts that Winchester had mounting indications that damages in the state court action were "likely to involve payment" under the Excess Policy well before March 5, 2003, the date it ultimately provided notice of the action. First, U.S. Liability points to the *ad damnum* clause of the complaint in the state court action, which alleges $5 million in damages for each of the two Claimants.

Second, U.S. Liability cites to the earlier status reports, in particular, to the reports dated September 9, 2002 and December 9, 2002; and to the Bills of Particulars, all of which discussed the extent of the Claimants' injuries and expressed the opinion that Winchester would likely be liable for those injuries. U.S. Liability claims that these documents, and other documents exchanged during discovery, provided Winchester with a clear basis upon which to conclude that the Excess Policy would likely be implicated months before Winchester actually provided notice of the potential claim.

In response, Winchester argues that it never formed a good-faith belief that the damages in the state court action would exceed the primary coverage amount, and thus, it was not required to provide notice to U.S. Liability under the Excess Policy. Winchester's President, Frank Sapeinza ("Sapeinza"), attests that although he received notice of the accident the day it occurred, he did not believe that the resulting injuries were serious based on Petrovich's account. (*See* Affidavit of Frank Sapeinza, dated June 8, 2004, at ¶¶ 4–8.) Sapeinza further attests that Winchester first received actual notice of the state court action in or about May 2002, about two months after the action was filed. (*See id.* at ¶ 9.)

Winchester places heavy reliance on the advice of its trial counsel during the progression of the state court action. Specifically, Winchester cites to other portions of the status reports where its trial counsel opined that the Claimants' injuries were

not serious and were likely not extensive in terms of monetary damages. According to Winchester, the first time it had any indication that the Claimants' counsel believed that the damages in the state court action would exceed $750,000 was after receipt of the last of these status reports. This report, dated February 28, 2003, discussed the Supplemental Bill of Particulars received by Winchester's trial counsel about a month earlier. Based on the revised Bill of Particulars, the report approximated the upper limit of the damages for one of the two Claimants to be in excess of $450,000. Nevertheless, Winchester's trial counsel opined in the February 28 report (as he did in the previous reports) that the damages would not exceed the primary coverage limit. According to Winchester, it nevertheless provided U.S. Liability with notice on March 5, 2003 shortly after the February 28, 2003 status report "as a precaution" so that U.S. Liability could participate in further discovery and in any settlement discussions. (Affidavit of Paul M. Schindler, dated June 10, 2004 ("Schindler Aff.") at ¶¶ 5–6.)

To substantiate its contention that the Claimants' injuries were not serious, Winchester points out that both Claimants were wearing their seatbelts during the accident and that neither incurred any broken bones, required hospitalization, or was bleeding following the accident. Winchester notes that the Claimants only visited the hospital at the insistence of individuals at the scene.

Upon careful consideration of the parties' arguments in light of the evidence in the record and after viewing the evidence in a light most favorable to Winchester, the Court holds that no rational factfinder could conclude that Winchester acted reasonably and diligently in waiting until March 5, 2003 to notify U.S. Liability of the state court action.[8] As discussed in greater detail below, the totality of the circumstances simply do not support Winchester's purported belief that the damages in the state court action would not exceed $750,000 or that its actions were reasonable under the circumstances.

Under New York law, the failure to provide timely notice of a claim under a notice provision in an insurance contract does not invalidate a claim if the insured can demonstrate that it was not "reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible." N.Y. Ins. Law § 3420(a)(4) (Consol.2004). In these circumstances, "[w]hen the duty to provide such notice commences requires an objective evaluation of the facts known to the insured." *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 275 (2d Cir.1992). In *Christiania*, the Second Circuit elaborated on the insured's duty to provide notice to the insurer as follows:

> The objective standard is one of reasonableness. While the duty to provide notice therefore does not begin on the basis of mere speculation, rumor, or remote contingencies far removed from the particular policy in question, ... when an insured complying with its duty to use due diligence in investigating potential claims against it would believe from the information available that its policy would be involved, the notice obligation arises.

*Id.* at 275–76 (citations omitted). The Second Circuit in *Christiania* further noted that the duty to notify may arise after an objective evaluation of all available information "even though there are some fac-

tors that tend to suggest the opposite." *Id.* at 276.

Because compliance with the notice provision is generally regarded as a condition precedent to the insurer's duty to indemnify the insured, the "failure to satisfy the notice requirement vitiates the policy." *Security Mut. Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 340 N.Y.S.2d 902, 293 N.E.2d 76, 78 (1972); *see also White v. City of New York,* 81 N.Y.2d 955, 598 N.Y.S.2d 759, 615 N.E.2d 216, 217 (1993). Accordingly, non-compliance with the notice provision is grounds for disclaiming coverage even where the insurer has not demonstrated prejudice. *See American Home Assurance Co. v. International Ins. Co.,* 90 N.Y.2d 433, 661 N.Y.S.2d 584, 684 N.E.2d 14, 18 (1997); *see also Olin Corp. v. Insurance Co. of N. Am.,* 966 F.2d 718, 723 (2d Cir.1992).

New York courts have interpreted the phrase "as soon as practicable" in connection with notice provisions in insurance contracts to require that notice be given within a reasonable amount of time under the circumstances. *See Eveready Ins. Co. v. Chavis,* 150 A.D.2d 332, 540 N.Y.S.2d 860, 861 (2d Dep't 1989) (citation omitted). Because the insured bears the burden of proving that its notice was timely under the circumstances, an insured may present evidence to excuse its delay. *See White,* 598 N.Y.S.2d 759, 615 N.E.2d at 217–18 (stating that "where a reasonable person could envision liability," and given the severity of the claimant's injury, the insured's failure to investigate the claim fully did not support its purported "reasonable belief of nonliability").

■ The issue of whether a delay in notifying an insurance company regarding a potential claim is reasonable under the circumstances is generally determined by the factfinder. *See Hartford Fire Ins. Co. v. Masternak,* 55 A.D.2d 472, 390 N.Y.S.2d 949, 952 (4th Dep't 1977). However,

where no excuse is proffered or when there is no credible evidence to support a proffered excuse, an undue delay may render notice to the insurer untimely as a matter of law. *See id.* As the New York Court of Appeals has explained,

> a good-faith belief of nonliability may excuse or explain a seeming failure to give timely notice.... But the insured's belief must be reasonable under all the circumstances, and it may be relevant on the issue of reasonableness, whether and to what extent, the insured has inquired into the circumstances of the accident or occurrence.

*Security Mut. Ins. Co.,* 340 N.Y.S.2d 902, 293 N.E.2d at 78. In *Security Mutual,* the Court of Appeals held that an insured's 19–month delay in notifying the insurer was unreasonable as a matter of law and could not be excused by a purported " 'lack of knowledge' or a 'belief of nonliability' " where the insured failed to properly investigate and evaluate its potential liability. *Id.* at 80.

Thus, summary judgment against the insured may be granted where there was a delay in providing notice without a good faith belief in non-liability or that excess coverage would not be implicated. *See 319 McKibben St. Corp. v. General Star Nat'l Ins. Co.,* 245 A.D.2d 26, 664 N.Y.S.2d 785, 788 (1st Dep't 1997) (finding that the insured's delay in notifying the excess insurance carrier of a potential claim was unreasonable as a matter of law); *Zadrima v. PSM Ins. Cos.,* 208 A.D.2d 529, 616 N.Y.S.2d 817, 818 (2d Dep't 1994) (holding that the insurer's cross-motion for summary judgment should have been granted in light of a four-month delay in notification during which time the insured possessed contemporaneous knowledge of potential liability). Moreover, without a reasonable explanation, "even relatively short periods of delay ... [can] be unreasonable as a matter

of law." *Kamyr, Inc. v. St. Paul Surplus Lines Ins. Co.*, 152 A.D.2d 62, 547 N.Y.S.2d 964, 967 (3d Dep't 1989) (citation omitted).

■ Viewing the evidence in a light most favorable to Winchester, the Court finds that a reasonable insured in Winchester's position would have believed that the state court action would likely involve payment under the Excess Policy. In this case, Winchester does not attempt to proffer an explanation for the delay in notifying U.S. Liability of the state court action. Rather, Winchester argues vehemently that it had a good-faith belief that the damages in the case would not exceed the primary coverage amount, and thus, it did not need to notify U.S. Liability of the state court action under the terms of the Excess Policy. Winchester notes that discovery was ongoing at the time that it provided notice.

In this regard, Winchester makes much ado about the differences in the precise wording between the notice provision of the Excess Policy and the notice provisions at issue in the numerous cases that U.S. Liability cites. According to Winchester, the requirement under the Excess Policy that notice be provided when an occurrence is "likely to involve payment" under the policy materially distinguishes this case from others where different language was employed, for example, where an occurrence is "likely to involve the policy", or "may result in a claim." Winchester urges this Court to refrain from re-writing the notice provision of the Excess Policy and to construe it favorably for its position. Winchester reminds the Court that it did not negotiate the notice provision at issue and that under the *contra proferentem* doctrine, any ambiguity should be resolved against the party that drafted the contract (in this case, U.S. Liability).

The Court finds that it is unnecessary to delve into a comprehensive analysis of the particular contractual language at issue here. The Court is persuaded that even under a construction of the notice provision most favorable to Winchester, the record before the Court clearly indicates that it was unreasonable as a matter of law for Winchester to not have notified U.S. Liability of the state court action well before March 5, 2003. Accordingly, summary judgment is proper in this case because no rational factfinder could conclude that Winchester acted reasonably under the circumstances.

First, it is undisputed that Winchester received actual notice of the accident from Petrovich on the day that it occurred. The record indicates that the Claimants' counsel contacted Utica, Winchester's primary insurance carrier, about a week later to inform them that the accident had occurred and that the injuries were serious. A subsequent communication between Claimants' counsel and Utica in January 2002 further detailed the severity of the Claimants'. injuries; indicated extensive property damage; and opined that Winchester was liable for these damages. While these communications were not directly with Winchester, the Court simply cannot countenance that Utica corresponded with the Claimants' counsel for months without ever notifying Winchester of these communications, particularly when the Claimants were persistently requesting information regarding excess insurance coverage.

Second, the commencement of the state court action in March 2002, involving distinct injuries to the two Claimants, was a significant indicator that the damages stemming from the accident conceivably could exceed $750,000. The complaint demanded $10 million in total damages. While the Court is mindful that the amount demanded is not always the best indicator of what the ultimate damages

may be, this damages figure, coupled with the allegations of the Claimants' injuries, should have put Winchester on further notice that the Excess Policy may be implicated. *See 319 McKibben St.,* 664 N.Y.S.2d at 787 (imputing awareness of the extent of potential liability, in part, from the amount of damages alleged in the complaint).

The Court cannot credit Winchester's unsubstantiated assertion that it did not receive actual notice of the state court action until May 2002—two months after the action was commenced. Even assuming Winchester did not receive the actual complaint until May 2002, the Court cannot fathom that Utica, a well-established and presumably reputable insurance company, would undertake Winchester's defense in the state court action and not contact Winchester almost immediately to, at the very least, obtain its account of the accident and to inform Winchester of the status of the claim.

Moreover, once Utica undertook Winchester's defense in the state court action, Utica, in essence, assumed the role of Winchester's agent for that purpose. *See* 70A N.Y. Jur. Ins. § 1946 (stating that in carrying out an insurer's duty to act in good faith during the defense of the insured, "the insurer acts as the agent of the insured"); *see also Graci v. Denaro,* 98 Misc.2d 155, 413 N.Y.S.2d 607, 608 (1979). Thus, notice to Utica can be imputed to Winchester, absent a compelling reason to the contrary. *See Martinson v. Massachusetts Bay Ins. Co.,* 947 F.Supp. 124, 129 (S.D.N.Y.1996) ("Under New York law, '[i]t is well-settled that the principal is

bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have been communicated to the principal'") (quoting *Farr v. Newman,* 14 N.Y.S.2d 183, 250 N.Y.S.2d 272, 199 N.E.2d 369 (1964)).

The Court is mindful that Winchester did not expressly authorize Utica to act as its agent in the state court action. Nonetheless, "[n]otice to the agent ... is notice to the principal, unless the person giving notice has reason to know that the agent has no duty to or will not transmit the message to the principal." *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l,* 608 F.2d 43, 46 (2d Cir.1979). There is nothing in the record to suggest that the Claimants had any reason to expect that Utica would not contact Winchester to report on the status of the pending action or to obtain further information. Indeed, the Claimants' several requests for information from Utica regarding excess coverage would suggest to the contrary. Accordingly, Winchester's attempts to employ Utica as an excuse for its purported lack of knowledge of the pertinent facts falls well short of the mark.[9]

Conspicuously absent in the record is any plausible explanation as to why the Claimants' repeated requests for information on excess insurance coverage went unanswered. The Court counts at least five occasions where the Claimants expressly inquired as to whether Winchester carried any excess insurance coverage and where no response was provided. To add insult to injury, when the Claimants finally received a response, it was not correct.[10]

---

9. Even absent agency principles, Winchester's purported lack of knowledge prior to May 2002 does not excuse its delay in providing notice because it was obligated to stay apprised of any potential claims arising from the accident once it received notice of the accident on the day that it occurred. *See Security*

*Mut.,* 340 N.Y.S.2d 902, 293 N.E.2d at 78 (noting that the insured "must exercise reasonable care and diligence to keep himself informed of accidents out of which claims for damages may arise").

10. Winchester provides no explanation why in Aranki's February 28, 2003 status report

While these inquiries regarding excess coverage were made directly to Utica and to Winchester's trial counsel, only Winchester could competently answer this question, and there is no basis upon which to infer that either Utica or Winchester's trial counsel could not or did not obtain the answer from Winchester. Nor was it unreasonable for the Claimants' counsel to seek information directly from Utica and Winchester's trial counsel, as these parties were clearly acting as representatives of Winchester in the state court action.

In light of the absence of sufficient evidence in the record for what appears to be blatant evasiveness on Winchester's part, Winchester's unsubstantiated explanation that it was unaware of these requests because they were directed to other parties is nothing short of disingenuous. As discussed above, Winchester may not claim ignorance amidst the barrage of activities that transpired in the months preceding and following the commencement of the state court action and that would have put any reasonable person on notice at least suggesting further inquiry. Indeed, based on the record as a whole, the Court surmises that the lack of responsiveness to the Claimants' requests for information was a conscious tactical decision on Winchester's part, borne out of a possible concern that disclosing the existence of the Excess Policy would adversely affect the prospects for a favorable settlement of the case.

Although the Court is persuaded that Winchester had sufficient knowledge of the state court action as of May 2002 from which it reasonably should have concluded that payment was possible under the Excess Policy, the materials produced in discovery further provided Winchester with reason to anticipate that the state court action likely would involve payment under the Excess Policy. Specifically, the first Bill of Particulars, submitted on or about November 13, 2002, provided more detail with regard to the Claimants' injuries, including a description of the surgery that each Claimant had undergone and the continuing pain each was suffering. In Aranki's December 9, 2002 status report, he evaluated the Bill of Particulars and opined that Winchester would likely be liable for the Claimants' damages.[11] Although Aranki characterized the Claimants' injuries as "not overly severe," he also acknowledged that they were significant because both Claimants underwent surgery. Finally, the January 24, 2003 Supplemental Bill of Particulars described additional injuries and estimated significant future medical costs for one of the Claimants arising from the accident.

Viewing this evidence in a light most favorable to Winchester, the Court finds Winchester's arguments that it reasonably did not believe that the Claimants' injuries would likely involve payment under the Excess Policy would be unpersuasive to any rational trier of fact.[12] While no single piece of evidence is dispositive, the Court finds that when all the evidence in the record is considered in the aggregate, there is no genuine issue of material fact as to whether Winchester acted reasonably in withholding notification until March 5,

(less than a week before U.S. Liability was finally notified), he represented to the Claimants' counsel that Winchester did not have excess coverage.

11. Aranki actually acknowledged Winchester's likely liability in his initial status report dated July 11, 2002. (*See* Schindler Aff. at Ex. B.)

12. The Court further notes that merely because there may not have been any apparent serious injuries at the time of the accident does not excuse Winchester's failure to provide timely notice. *See New York Cent. Mut. Fire Ins. Co. v. Riley*, 234 A.D.2d 279, 650 N.Y.S.2d 308, 310 (2d Dep't 1996).

2003. Thus, Winchester's suggestion that there was insufficient discovery as of March 2003 upon which to form a reasonable belief that the damages under the Excess Policy would likely exceed $750,000 is unavailing in light of the significant contrary evidence demonstrating the potential for liability to exceed that amount.

Winchester attempts to counter this evidence by citing to the portions of the status reports where its trial counsel opines that the Claimants' injuries were not severe. This argument is similarly unpersuasive because Winchester was under a duty to act reasonably under the totality of all the information it had (or should have had) available to it in determining whether payment under the Excess Policy was likely. Winchester's decision to rely almost exclusively on its trial counsel does not alter its duty to consider all the available information and to conduct itself as a reasonable insured would have in similar circumstances.

Contrary to Winchester's assertion, prompt notice to U.S. Liability in the face of Winchester's trial counsel's opinion regarding the value of the state court action does not amount to "second-guessing" the advice of its counsel. Winchester had an independent duty to investigate and consider the totality of the evidence and cannot simply delegate this duty to counsel when there were other significant indications to the contrary.[13] *See Christiania,* 979 F.2d at 276 (stating that a reasonable possibility that a claim could implicate a policy "may exist even though there are some factors that tend to suggest the opposite"). While it is not unreasonable for Winchester to have considered the advice

of its counsel under these circumstances, Winchester also was required to consider all the other available information, as discussed above. The Court notes that Winchester is a corporate entity, presumably with individuals possessing business acumen, including competent corporate counsel in addition to its trial counsel. Thus, this is not a case where a party is an individual with unequal bargaining power and less business knowledge.

In sum, the Court finds that there is no genuine issue of material fact as to whether Winchester provided timely notice to U.S. Liability of the state court action. The record supports a finding that Winchester should have provided notice as early as March 2002, when the action was filed, and certainly by January 2003, when the Supplemental Bill of Particulars was produced. Thus, the Court concludes that no reasonable factfinder could find that Winchester's notice on March 5, 2003 was timely under the notice provision of the Excess Policy.

## C. *THE CLAIMANTS' NOTICE*

Having determined that Winchester's delay in notifying U.S. Liability of the state court action was unreasonable as a matter of law, the Court now turns to the Claimants' argument that they cured Winchester's untimely notice. According to the Claimants, they cured any untimely notice by Winchester by informing U.S. Liability of the state court action pursuant to New York Insurance Law § 3420(a)(3) (" § 3420(a)(3)").[14] Under § 3420(a)(3), an injured party has an independent right to notify any licensed agent of the insurer in

---

13. Moreover, the record does not reflect (nor does Winchester argue) that Winchester's trial counsel expressly advised Winchester that there was no need to notify U.S. Liability of the state court action. Counsel advised only that in his opinion the damages would not exceed $750,000. Winchester remained at

liberty, as an exercise of prudent business judgment, to notify U.S. Liability notwithstanding counsel's opinion.

14. Winchester raises the same argument in its reply submissions.

the state of a potential claim and any such notice constitutes notice to the insurer. *See* N.Y. Ins. Law § 3420(a)(3) (Consol.2004). Such notice, however, must be made "as soon as . . . reasonably possible" once the injured party learns of the insurance. *Id.* § 3420(a)(4). The Claimants seek to invoke § 3420(a)(3) to overcome Winchester's untimely notice, and as such, proffer their diligent efforts to discover the existence of Excess Policy as a mitigating circumstance to excuse Winchester's delay in providing notice to U.S. Liability. In particular, the Claimants highlight Winchester's and its agents' repeated failure to respond to their inquiries regarding excess coverage and their ultimate misrepresentation that Winchester lacked such coverage. The Claimants assert that they timely notified U.S. Liability of their claim on May 20, 2003 after receiving U.S. Liability's disclaimer letter on April 21, 2003.

U.S. Liability responds that the Claimants did not cure Winchester's untimely notice because they (the Claimants) were not the first to notify U.S. Liability of the state court action. Although there is no statutory requirement that the injured party's notice must occur prior to any notice by the insured, several courts applying § 3420(a)(3) have so held.[15] *See, e.g., Ringel v. Blue Ridge Ins. Co.,* 293 A.D.2d 460, 740 N.Y.S.2d 109, 111 (2d Dep't 2002)

(stating that "where the insured is the first to notify the carrier, even if that notice is untimely, any subsequent information provided by the injured party is superfluous for notice purposes"); *Massachusetts Bay Ins. Co. v. Flood,* 128 A.D.2d 683, 513 N.Y.S.2d 182, 183 (2d Dep't 1987) (noting that where the insured had already notified the insurer, the injured party's subsequent notice was "superfluous"); *Mount Vernon Fire Ins. Co. v. Orange Intercept, Ltd.,* No. CV–92–1986, 1992 WL 368085, at *3 (E.D.N.Y. Nov. 19, 1992) (stating that "once the insured gives late notice to the insurer an injured party cannot give timely notice under section 3420(a)(4) because 'any subsequent information provided by the injured party [is] . . ., for notice purposes, superfluous . . . .' ") (citation omitted).

The Court agrees with the rationale of these courts. Once an insurer has received notice from the insured, whatever notice requirements may be applicable are *prima facie* satisfied (subject to any challenge by the insurer). Thus, the ability of an injured party to provide notice to the insurer in lieu of the insured under § 3420(a)(3) is moot once notice has been accomplished by the insured.[16]

■ In this case, the Claimants do not dispute that Winchester was the first to

---

**15.** Some courts have held to the contrary. *See, e.g., Walters v. Atkins,* 179 A.D.2d 1067, 579 N.Y.S.2d 525, 527 (4th Dep't 1992) (stating that first notice by the insured does not extinguish the injured party's ability to cure the insured's untimeliness because the "injured party has an independent right to provide written notice to an insurer and cannot be bound by an insured's late notice"). Relying on *Lauritano v. American Fidelity Fire Ins. Co.,* 3 A.D.2d 564, 162 N.Y.S.2d 553 (1st Dep't 1957), Winchester argues that the Claimants' notice need not be the first notice that U.S. Liability received provided that the notice was timely under the circumstances. The injured parties in *Lauritano,* however, did

in fact provide first notice to the insurer, and thus, that decision is materially distinguishable from the facts presented here. *See id.* at 556–57.

**16.** Lending further support, albeit indirectly, to a "first-notice" requirement, a recent Second Circuit case interpreting New York law held that an insurer need not specifically disclaim as to an injured party when the injured party provides notice after the insured because the injured parties's notice in that case would be "superfluous." *Webster v. Mount Vernon Fire Ins. Co.,* 368 F.3d 209, 218 n. 6 (2d Cir.2004) (citation omitted).

inform U.S. Liability of the state court action. Thus, because the Claimants were not the first to provide such notice, the Court rejects the Claimants' and Winchester's arguments that the Claimants' notice cured Winchester's untimely notice. Winchester thus removed the Claimants' practical ability to cure Winchester's untimely notice when it notified U.S. Liability on March 5, 2003.

Aside from a "first notice" requirement, the Court also rejects the Claimants' argument that their May 20, 2003 notice constituted timely notice of the state court action to U.S. Liability on the additional grounds that, based on the evidence in the record, such notice was untimely as a matter of law. Section 3420(a)(4) of the New York Insurance Law requires that the Claimants (and Winchester) provide notice "as soon as was reasonably possible" under the circumstances. N.Y. Ins. Law § 3420(a)(4) (Consol.2004). With regard to the Claimants, the applicable standard is reasonable diligence based on all the information they knew or should have known. *See Eveready Ins. Co. v. Chavis*, 150 A.D.2d 332, 540 N.Y.S.2d 860, 861 (2d Dep't 1989) (stating that courts should evaluate the reasonableness of notice by the injured party according to the circumstances rather than by the mere passage of time) (citations omitted). The injured party bears the burden of showing that any delay was reasonable. *See id.*

The Court agrees with the Claimants that they should not be vicariously charged with Winchester's dilatory practices. The record is clear that the Claimants diligently sought information on excess coverage from Utica and Winchester's trial counsel during the period from April 2001 through March 2003. The Claimants, however, received notice of the Excess Policy on or about April 1, 2003 and waited approximately 50 days to formally provide notice to U.S. Liability. Moreover, the Claimants' May 20, 2003 notice was sent approximately 29 days after the Claimants received U.S. Liability's disclaimer on April 21, 2003.

Neither the Claimants nor Winchester offer any explanation as to why the Claimants prior diligence suddenly terminated once the existence of the Excess Policy was revealed. As discussed above, unexplained delays, even if brief, can be unreasonable as a matter of law. *See Kamyr*, 152 A.D.2d 62, 547 N.Y.S.2d 964, 967 (citation omitted). While the Court is mindful that a notice provision should not be applied as strictly to an injured party as it would to the insured, *see Elmuccio v. Allstate Ins. Co.*, 149 A.D.2d 653, 540 N.Y.S.2d 465, 467 (2d Dep't 1989), the Court finds that the Claimants' unexplained 50–day delay in notifying U.S. Liability of the state court action is untimely as a matter of law. Accordingly, the Court rejects the Claimants' attempts to use their May 20, 2003 notice of the state court action to cure Winchester's untimely notice.[17]

## D. *U.S. LIABILITY'S DISCLAIMER OF COVERAGE*

Finally, Winchester contends that U.S. Liability should not be permitted to disclaim coverage in this case because it did not timely provide its disclaimer notice pursuant to section 3420(d) of the New York Insurance Law. According to Winchester, U.S. Liability lost its right to disclaim based on its conduct. Specifically, Winchester contends that U.S. Liability had sufficient information from which to disclaim coverage as of March 6, 2003, the

---

**17.** Moreover, from a policy standpoint, the Court notes that Winchester should not benefit from its disingenuous conduct to the detriment of U.S. Liability by invoking the actions of the Claimants.

day it received the complaint, yet waited until April 14, 2003 to disclaim coverage.

Winchester further argues that U.S. Liability waived its right to disclaim coverage through its conduct after it was notified of the state court action. Specifically, Winchester points to its April 1, 2003 cover letter to U.S. Liability where Winchester states that it was interpreting U.S. Liability's request for documents relating to the state court action as an acknowledgment of coverage. According to Winchester, U.S. Liability failed to contradict this statement until it ultimately disclaimed coverage two weeks later. Finally, Winchester asserts that U.S. Liability's request for privileged documents and its failure to issue a reservation of rights letter is consistent with an acceptance of coverage. For these reasons, Winchester asks this Court to find that U.S. Liability waived its right to disclaim and should be equitably estopped from so doing. For the reasons discussed below, the Court concludes that Winchester's arguments on this issue are without merit.

■ Generally, an insurer is entitled to assert a defense of non-compliance with a notice provision as a basis to deny coverage and indemnification. *See In Matter of Allcity Ins. Co. and Jimenez,* 78 N.Y.2d 1054, 576 N.Y.S.2d 87, 581 N.E.2d 1342, 1343 (1991). Under New York Law, an insurer seeking to disclaim liability must provide written notice of its intent to disclaim "as soon as is reasonably possible . . . to the insured and the injured person or any other claimant." N.Y. Ins. Law § 3420(d) (Consol.2004) (" § 3420(d)"). An insurer can, however, waive this affirmative defense if it is unreasonably late in disclaiming liability. *See New York Univ. v. First Fin. Ins. Co.,* 322 F.3d 750, 753 n. 3 (2d Cir.2003) (citation omitted). Moreover, an insurer must provide timely notice of disclaimer under the circumstances even if, as in this case, the insured's notice was

untimely. *See First Fin. Ins. Co. v. Jetco Contracting Corp.,* 1 N.Y.3d 64, 769 N.Y.S.2d 459, 801 N.E.2d 835, 837 (2003).

As with the question of whether an insured provided timely notice of a possible claim, the question of whether an insurer timely disclaimed liability is determined in light of the surrounding circumstances. *See New York Univ.,* 322 F.3d at 754 (citation omitted). When considering a disclaimer, the "timeliness . . . is measured from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage." *First Financial,* 1 N.Y.3d 64, 769 N.Y.S.2d 459, 801 N.E.2d 835, 838–39 (citation omitted). Generally, it is reasonable for an insurer to conduct an investigation in order to determine whether there are grounds for disclaiming. *See id.* at 839 ("investigation into issues affecting an insurer's decision whether to disclaim coverage obviously may excuse delay in notifying the policyholder of a disclaimer . . . .") (citation omitted); *Public Serv. Mut. Ins. Co. v. Harlen Hous. Assocs.,* 7 A.D.3d 421, 777 N.Y.S.2d 438, 440 (1st Dep't 2004) (stating that it is reasonable for an insurer to investigate prior to disclaiming coverage so that the disclaimer is based on "concrete evidence" and does not result in "piecemeal disclaimers") (internal quotations and citations omitted).

Nonetheless, delaying disclaimer for investigative purposes is unreasonable "where the basis for denying coverage was or should have been readily apparent before the onset of the delay." *First Financial,* 769 N.Y.S.2d 459, 801 N.E.2d at 839 (citation omitted); *see also New York Univ.,* 322 F.3d at 756 (stating that the investigation must be related to the insurer's purported reason for disclaiming); *Mount Vernon Fire Ins. Co.,* 193 F.Supp.2d at 677–78 (holding that a 50–day delay to conduct an investigation was

reasonable as a matter of law and noting that there is "no point in discouraging insurers from conducting thorough investigations before disclaiming coverage, as long as they are not used as a dilatory tactic").

■ Winchester asserts that U.S. Liability's disclaimer was improper under § 3420(d) because 39 days lapsed before it provided notification of its disclaimer. The operative date, however, is not when U.S. Liability received initial notice of the complaint in the state court action. Rather, it is the date that U.S. Liability received the documents it requested related to the state court action. *See Allcity Ins. Co.*, 576 N.Y.S.2d 87, 581 N.E.2d at 1343 (stating that the "timeliness of an insurer's disclaimer is measured from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage") (citation omitted). The record in this case is clear that U.S. Liability disclaimed coverage against Winchester on April 14, 2003, just two weeks after it received the state court action documents on April 2, 2003—documents that included numerous status reports and two detailed Bills of Particulars. The Court finds that under the circumstances it was reasonable as a matter of law for U.S. Liability to disclaim 14 days after it received these documents.

■ In this regard, the Court disagrees with Winchester that U.S. Liability has taken inconsistent positions with respect to its arguments relating to the effect of the *ad damnum* clause in the complaint. Winchester asserts that U.S. Liability cannot argue on the one hand that Winchester should have determined, based solely on the $10 million demand in the complaint, that payment under the Excess Policy would be likely while on the other hand argue that it was reasonable for it (U.S.Liability) to request additional information beyond the complaint in order to disclaim

coverage. This argument is unpersuasive. A more accurate reading of U.S. Liability's position is that Winchester should have determined that notification was required based upon the complaint *and* all the other available materials and all the events that occurred before and after the filing of the state court action, as discussed above. U.S. Liability, in contrast, requested documents related to the state court action in order to confirm whether Winchester had in fact acted reasonably in waiting until March 2003 to provide notification pursuant to the Excess Policy. Thus, the Court rejects Winchester's argument that U.S. Liability has taken inconsistent positions in this action.

Moreover, this is not a case where the insurer's delay is unexplained. U.S. Liability has proffered a reasonable explanation to excuse its brief delay, namely, to investigate whether Winchester possessed sufficient information from which to reasonably conclude that the state court action would not likely involve payment under the Excess Policy, and to make an appropriate decision regarding coverage. In light of this explanation, the Court concludes that a two-week period to disclaim coverage under § 3420(d) was reasonable as a matter of law.

The Court also concludes that U.S. Liability's April 14, 2003 disclaimer against Winchester was equally effective as against the Claimants. Under New York law, if the insurer disclaims coverage of the insured when the injured party has not provided notice under section 3420(a)(3), the insurer's disclaimer operates equally against the injured parties as well. *See Webster v. Mount Vernon Fire Ins. Co.*, 368 F.3d 209, 217–18 & n. 6 (2d Cir.2004); *In re First Cen. Ins. Co.*, 3 A.D.3d 494, 771 N.Y.S.2d 141, 141 (2d Dep't 2004).

In this case, it is undisputed that U.S. Liability disclaimed coverage on April 14,

2003, well before the Claimants attempted to provide their notice to U.S. Liability on May 20, 2003. Where the insurer does not raise a particular ground for disclaiming coverage in its disclaimer letter, such ground is considered waived. *See General Accident Ins. Group v. Cirucci*, 46 N.Y.2d 862, 414 N.Y.S.2d 512, 387 N.E.2d 223, 224–25 (1979); *Abreu v. Chiung Huang*, 300 A.D.2d 420, 751 N.Y.S.2d 583, 584 (2d Dep't 2002). Such is not the case here, however, because a copy of U.S. Liability's disclaimer was sent to the Claimants' counsel at the same time it was sent to Winchester and the disclaimer expressly stated: "Thus, we also specifically disclaim coverage to the claimants, by copy of this letter to claimants' counsel, . . ., for failure to provide timely notice of the occurrence, . . . ." (Declaration of Steven Verveniotis, dated May 19, 2004, at Ex. B.) Thus, the Court finds that U.S. Liability's April 14, 2003 disclaimer was effective as to both Winchester and the Claimants because U.S. Liability's intent to disclaim and its grounds for so doing were clearly communicated to the Claimants.

Turning to Winchester's arguments for the application of the equitable doctrines of estoppel and waiver against U.S. Liability, the Court finds no basis to grant Winchester such relief. Winchester asserts that U.S. Liability's conduct gave it a clear indication that it would be providing coverage in the state court action, and thus, U.S. Liability waived its right to disclaim and should be equitably estopped from so doing. Winchester argues that U.S. Liability's failure to issue a reservation-of-rights letter; its request for privileged status reports prepared by Winchester's trial counsel; and its failure to contradict Winchester's statement that U.S. Liability would be providing coverage all evince a clear intention to accept coverage for the state court action. Winchester seeks to estop U.S. Liability from disclaiming based on Winchester's alleged detrimental reliance on this indication.

Generally, even if an insured did not timely notify its insurer of potential liability, the insured may still propound the equitable defenses of waiver and estoppel. *See Albert J. Schiff Assocs., Inc. v. Flack*, 51 N.Y.2d 692, 435 N.Y.S.2d 972, 417 N.E.2d 84, 87 (1980). Under New York law, however, an insurer's failure to provide a timely disclaimer may serve as grounds for equitable estoppel only upon a showing of prejudice. *See Vecchiarelli v. Continental Ins. Co.*, 277 A.D.2d 992, 716 N.Y.S.2d 524, 526 (4th Dep't 2000) (citations omitted). Waiver occurs when a party intentionally relinquishes a known right. *See Goudie v. State of New York*, 291 A.D.2d 432, 737 N.Y.S.2d 539, 540 (2d Dep't 2002). In the context of insurance coverage, waiver typically applies where there is circumstantial evidence that demonstrates that an insurer intended to abandon the defense of the insured. *See Flack*, 435 N.Y.S.2d 972, 417 N.E.2d at 87. However, an insured is not entitled to an equitable defense where its insurer did not convey "clear notice that neither a defense nor an indemnification could be assured." *Travelers Prop. Cas. v. Weiner*, 174 Misc.2d 831, 666 N.Y.S.2d 392, 394 (1997).

In the present case, U.S. Liability did not undertake Winchester's defense as it was unaware of the action until March 5, 2003. U.S. Liability neither made any statements regarding coverage until its disclaimer, nor did it give any other indication to Winchester that it intended to provide a defense or indemnify Winchester. There is nothing in the record to suggest that U.S. Liability knowingly relinquished its right to disclaim coverage. Accordingly, Winchester cannot in good faith claim that it detrimentally relied upon U.S. Liability to provide a defense when it is clear that U.S. Liability took no action to that

effect and where Utica was providing presumably competent defense.

Under New York law, as discussed above, (and under the terms of the Excess Policy) U.S. Liability was entitled to conduct an investigation to determine whether grounds exist to disclaim liability. Thus, U.S. Liability's request for privileged status reports did not act as a waiver of its right to disclaim under the Excess Policy. Nor did the receipt of these reports, standing alone, unduly prejudice Winchester. In *United States Fidelity & Guaranty Co. v. New York Susquehanna & Western Railway. Corp.*, 275 A.D.2d 977, 713 N.Y.S.2d 624, 625–26 (4th Dep't 2000), the court found that the insurer was equitably estopped from disclaiming coverage on the eve of a settlement conference after not only having received privileged status reports, but also after having participated in the insured's defense, having exchanged information with attorneys, and after having approved of depositions and settlement discussions. *See id.* at 625–26. Such significant involvement with Winchester's defense is not present in this case. Rather, the Court finds that U.S. Liability's request for these documents was a valid exercise of its rights to perform an investigation prior to disclaiming coverage.

■ With regard to the absence of a reservation-of-rights letter, Winchester does not allege that U.S. Liability was under any statutory or contractual obligation to provide such a letter. Accordingly, the record does not support a finding that U.S. Liability's failure to issue a reservation-of-rights letter affects its rights to disclaim coverage. In any event, the lack of a reservation-of-rights letter is not a basis upon which to presume coverage when the insurer has not undertaken the defense of the insured. *See K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, No. 92 Civ. 5249, 1997 WL 96551, at *8 (S.D.N.Y. Mar. 5, 1997) ("If ... the insurer does not begin to provide the insured benefits under the Policy, there is not sufficient reason for the insured to assume that the absence of a reservation of rights letter is indicative of the existence of coverage.") (quoting 1 Allan Windt, Insurance Claims & Disputes § 2.20 at pp. 72–74 (3d ed.1995)).

Contrary to Winchester's contention, U.S. Liability's silence regarding the April 1, 2003 cover letter from Aranki does not represent a clear indication that U.S. Liability would accept coverage and indemnification of Winchester. It is evidence that U.S. Liability first needed to obtain the relevant documents in order to make its determination as to whether there was a valid basis to disclaim coverage. As discussed above, such investigation is encouraged to prevent premature or piecemeal disclaimers and Winchester has not demonstrated any prejudice therefrom. *See Harlen Housing Assocs.*, 777 N.Y.S.2d at 440.

Indeed, the Court finds that the balance of the equities in this case tips in U.S. Liability's favor. Due to Winchester's late notice, U.S. Liability did not have the opportunity to participate in any settlement discussions or preliminary litigation strategy. Nor could U.S. Liability extensively investigate the underlying claim because Winchester notified it almost a full year after the filing of the state court action. In short, U.S. Liability was denied its "bargained-for contractual right to decide for itself whether and how extensively to investigate." *American Home Assurance Co. v. International Ins. Co.*, 90 N.Y.2d 433, 661 N.Y.S.2d 584, 684 N.E.2d 14, 18 (1997). Accordingly, the Court denies Winchester's requests for the application of equitable estoppel and waiver.

Finally, the Court notes that parties seeking to invoke this Court's powers in equity must come with "clean hands."

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ("[H]e who comes into equity must come with clean hands.") (internal quotations omitted). As discussed above, the record in this case casts serious doubt on Winchester's good-faith conduct with respect to disclosing the existence of the Excess Policy. The record strongly suggests that Winchester was unexplainably evasive and perhaps even ultimately deceptive when faced with repeated clear and express requests from the Claimants for information regarding its excess coverage. With no compelling explanation in the record for this conduct, Winchester is in no position to seek equitable relief.

Accordingly, the Court grants U.S. Liability's motion for summary judgment in all respects and denies Winchester's and the Claimants' cross-motions for summary judgement in their entirety.

### III. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the motion of plaintiff U.S. Liability Insurance Company ("U.S.Liability") for summary judgment is GRANTED in its entirety. The Court declares that U.S. Liability is not required to defend and indemnify defendant Winchester Fine Art Services ("Winchester") under Winchester's excess insurance policy number CUP 1003061 in the action pending in New York State Supreme Court, Bronx County, Index No. 14711/02 brought by defendants Lindon F. McKenzie and Jason Denny (the "Claimants") against Winchester; and it is further;

**ORDERED** that the cross-motions of Winchester and the Claimants for summary judgment are DENIED in their entirety. All the counterclaims of Winchester and the Claimants are dismissed with prejudice.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**